# United States Court of Appeals
## For the First Circuit

No. 12-1152

LAWRENCE TRAINOR,

Plaintiff, Appellee,

v.

HEI HOSPITALITY, LLC ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Howard, Ripple[*] and Selya,

Circuit Judges.

Lynn A. Kappelman, with whom Lisa J. Damon, Gerald L. Maatman, Jr., James M. Hlawek and Seyfarth Shaw LLP were on brief, for appellants.
Gary M. Feldman, with whom Davis, Malm & D'Agostine, P.C. was on brief, for appellee.

October 31, 2012

---

[*]Of the Seventh Circuit, sitting by designation.

**SELYA**, **Circuit Judge**. A time worn proverb teaches that "Hell hath no fury like a woman scorned." Much the same dynamic can be in play when, as in this case, a corporation abruptly cashiers a member of senior management who believes that he deserves better.

In this instance the denouement prompted a suit for age discrimination and retaliation. After a protracted trial, the jury found the employer guilty of retaliation and returned a seven-figure verdict in the employee's favor. The district court allowed the liability finding to stand; trimmed the damages but doubled what remained; refused to grant either judgment notwithstanding the verdict or an unconditional new trial; and awarded the prevailing plaintiff attorneys' fees and an equitable remedy. The employer appeals.

After careful consideration of a scumbled record, we conclude that the sum awarded for emotional distress damages, even after the district court's remittitur, remains grossly excessive. We order a further remittitur. This order, in turn, affects the outcome of the doubling of damages undertaken by the district court. In all other respects, we reject the employer's challenges. The tale follows.

## I. BACKGROUND

We rehearse the facts as the jury supportably could have found them, guided by the tenet that "when the losing party

protests the sufficiency of the evidence, the court of appeals must take both the facts and the reasonable inferences therefrom in the light most hospitable to the jury's verdict." Casillas-Díaz v. Palau, 463 F.3d 77, 79 (1st Cir. 2006) (internal quotation marks omitted).

Plaintiff-appellee Lawrence Trainor, then 59 years of age, was enticed to join HEI Hospitality, LLC in the fall of 2006 after a long and distinguished career in hospitality management.[1] The plaintiff was recruited by HEI's chief operating officer, Ted Darnall, to become HEI's senior vice-president for acquisitions and transitions (SVP). Above and beyond assisting with acquiring and transitioning new hotel properties into HEI's sphere of influence, the plaintiff also recruited and mentored general managers, developed a "playbook" to organize integration strategies, and worked with "priority" hotels.

The terms of HEI's initial offer required the plaintiff to relocate to Norwalk, Connecticut (where HEI maintains its headquarters). The plaintiff balked at this requirement, however, and argued against a move from his home in Marshfield, Massachusetts because of his wife's health. A compromise was reached: the plaintiff would spend Mondays (and any other days on

---

[1] The plaintiff sued three defendants: his employer and two of its subsidiaries, HEI Hospitality Management LLC and Merritt Hospitality LLC. For ease in exposition, we refer to all three corporations collectively as "HEI."

which his presence was needed) in Norwalk and travel from Marshfield to the properties that demanded his attention during the balance of the week.

The company's hierarchs were consistently pleased with the plaintiff's management style and overall job performance: he received rave reviews from the chief executive officer Gary Mendell, Darnall, and the senior vice-president for human resources Nigel Hurst. Storm clouds began to gather in the fall of 2008, when rumors began about the possibility of restructuring the executive team. After Brian Meyer was brought in as senior vice-president of operations, top-echelon executives received an adjuration about a perceived need to relocate to Norwalk.

In November, Darnall offered the plaintiff a choice: relocate to Norwalk or assume the general manager's position at a hotel located in Cambridge, Massachusetts. HEI claims that the relocation was necessary because it intended to promote the plaintiff to a regional senior vice-president position. But the plaintiff was never actually offered such a position (or so the jury could have found).

During the next two weeks, the plaintiff had follow-up conversations with both Darnall and Hurst and learned that the demotion to general manager would be accompanied by a substantial cut in salary and a discontinuance of his participation in HEI's company-sponsored investment funds (described in more detail

-4-

infra). Dismayed by this turn of events, the plaintiff engaged counsel. His lawyer wrote to Mendell on December 4, expressing the plaintiff's disappointment with the recent developments at HEI. The letter made clear that the plaintiff was both reluctant to relocate and distressed by the prospect of being shifted to a lower-level position. Of particular pertinence for present purposes, the letter suggested that age discrimination was the driving force behind HEI's planned restructuring and the plaintiff's threatened demotion. Upon receiving this missive, Mendell — by his own admission — was "surprised," was "frustrated," and "wasn't happy." He regarded the age discrimination claim as "preposterous."

The plaintiff had some incidental communication with Hurst regarding the December 4 letter. Thereafter, he met face-to-face with Mendell, who told him for the first time that his position had been eliminated. This discussion left only the Cambridge job on the table; Mendell made no mention of the regional senior vice-president position that HEI ostensibly intended to offer to the plaintiff. The plaintiff began to negotiate the terms of the lesser position and requested that HEI maintain his current salary, allow him to continue to participate in all the company-sponsored investment funds, and keep him involved in a certain number of acquisitions per year. Mendell countered by offering, among other things, to increase the salary figure to $200,000

(still appreciably below the salary then being paid to the plaintiff) and to permit the plaintiff to vest in two of HEI's three investment funds.

On December 20, the plaintiff's lawyer wrote to Mendell expressing dissatisfaction with the counter-proposal and reiterating the plaintiff's earlier requests. In a telephone conversation nine days later, Mendell told the plaintiff that he was "pissed." Seeking to reach common ground, the plaintiff asked Mendell to give him a written offer anent the new position. Mendell furnished a written offer later that day, but the offer did not address any of the plaintiff's demands. It did, however, include a stipulation that the offer be accepted in writing by January 2, 2009.

On Tuesday, December 30, the plaintiff notified a phalanx of HEI officials, including Darnall and Hurst, that he would be working remotely that week and taking vacation the following week. In response, Darnall extended good wishes for the plaintiff's vacation and stated that he would call in the next few days.

On January 2, 2009, the plaintiff filed a charge of age discrimination with the Massachusetts Commission Against Discrimination (MCAD). The plaintiff's lawyer forwarded a copy of the charge to Mendell. His transmittal letter indicated that the plaintiff remained "amenable" to working out a solution with HEI. Mendell received the letter (including the copy of the MCAD charge)

on January 2.  Three hours after he received these materials, Mendell fired the plaintiff via e-mail.  The e-mail explained that the offer of the Cambridge position expired on January 2 and his current position no longer existed.  Mendell concedes that he did not even read the details of the age discrimination charge before cashiering the plaintiff.

The plaintiff, after exhausting administrative remedies, filed suit in federal district court alleging that HEI had both discriminated and retaliated against him in violation of applicable federal and state law.  Specifically, the plaintiff invoked the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623, and Mass. Gen. Laws ch. 151B, § 4.

After extensive pretrial discovery, an eight-day trial ensued.  The jury returned a special verdict in which it found HEI liable for retaliation (but not for age discrimination) and awarded the plaintiff $500,000 in back pay, $750,000 in front pay, and $1,000,000 for emotional distress.  Since the jury determined that HEI had knowingly violated state law, the court entered an order doubling the plaintiff's damages.  See Trainor v. HEI Hosp'y, LLC (Trainor I), No. 09-10349, 2011 WL 1670234 (D. Mass. Apr. 14, 2011) (citing Mass. Gen. Laws ch. 151B, § 9).

HEI responded to the verdict and the multiplication order with a flood of motions.  These included motions seeking alternative relief: judgment as a matter of law, a series of

remittiturs, an unconditional new trial, and vacation of the order for double damages. For his part, the plaintiff moved for an award of attorneys' fees and renewed an earlier request for an injunction allowing his continued participation and vesting in certain HEI-sponsored investment funds. The district court denied HEI's motions for judgment as a matter of law and a new trial, refused to remit the awards of either front or back pay, cut the award of emotional distress damages in half, adhered to its earlier ruling that double damages were appropriate, and allowed the motion for attorneys' fees. See Trainor v. HEI Hosp'y, LLC (Trainor II), No. 09-10349, 2012 WL 119597 (D. Mass. Jan. 13, 2012). In a separate order, the court granted the request for equitable relief. See Trainor v. HEI Hosp'y, LLC (Trainor III), No. 09-10349, 2012 WL 113384 (D. Mass. Jan. 13, 2012). This timely appeal followed.

## II. ANALYSIS

We subdivide our analysis into seven segments, which in the aggregate address all of HEI's myriad claims of error.

### A. Liability.

We start with the district court's denial of HEI's motion for judgment as a matter of law. See Fed. R. Civ. P. 50(b). This inquiry engenders de novo review. See Casillas-Díaz, 463 F.3d at 80. When conducting such an inquiry, we must take the evidence and all reasonable inferences therefrom in the light most flattering to the nonmovant. Id. at 80-81. In performing this tamisage "we may

-8-

not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987). A motion for judgment as a matter of law should be granted "only when the evidence, viewed from this perspective, is such that reasonable persons . . . could not have reached the conclusion that the jury embraced." Casillas-Díaz, 463 F.3d at 81.

In this instance, there is no smoking gun; that is, there is no direct evidence of retaliation. In such a situation, succeeding on a claim of retaliation under either federal or Massachusetts law entails proof that "(1) [the plaintiff] engaged in protected conduct under federal or [state] law; (2) [he] suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action." McMillan v. Mass. SPCA, 140 F.3d 288, 309 (1st Cir. 1998). In order to make a prima facie showing of these elements, it is not necessary that the plaintiff succeed on the underlying claim of discrimination; "[i]t is enough that the plaintiff had a reasonable, good-faith belief that a violation occurred; that he acted on it; that the employer knew of the plaintiff's conduct; and that the employer lashed out in consequence of it." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991).

Once the plaintiff makes his prima facie showing, the burden shifts to the defendant to produce evidence of a

-9-

"legitimate, non-retaliatory reason" for the adverse employment action. McMillan, 140 F.3d at 309. If the defendant produces such evidence, the burden reverts to the plaintiff to prove that "the real reason for the decision" was retaliatory. Id.

In the case at hand, the record contains ample evidence that the plaintiff engaged in protected conduct, namely, his voiced suspicions about the allegedly discriminatory nature of HEI's proposed restructuring and his filing of a formal charge of discrimination with the MCAD. By the same token, it is transparently clear that adverse employment actions occurred. Not surprisingly, then, HEI's challenge to the sufficiency of the plaintiff's proof of retaliation focuses with laser-like intensity on the causation element.

There is a common-sense aspect to causation: to establish that an adverse employment action was caused by an employee's protected activity, the employer's decision to act adversely to the employee must postdate the protected activity. Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia, 671 F.3d 49, 56 (1st Cir. 2012); Sabinson v. Trs. of Dartmouth Coll., 542 F.3d 1, 5 (1st Cir. 2008). It follows that an employer "need not suspend previously planned [decisions] upon discovering that a [discrimination] suit has been filed." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) (per curiam). In an attempt to bring itself within this safe harbor, HEI asseverates that no

-10-

cause-and-effect relationship can exist here because the adverse employment actions were a foregone conclusion prior to the plaintiff's protected conduct.  See id.

The weakness in HEI's asseveration is that the record admits of conflicting interpretations about the events that transpired from November 2008 through January 2009.  Although HEI suggests that a jury could not supportably find retaliation because the elimination of the plaintiff's position and his eventual termination were part of a larger plan set in motion long before the plaintiff engaged in any protected activity, the plaintiff counters that matters were in flux until after he engaged in the protected activities.

It is not our province to choose between the competing scenarios sketched by the parties.  Instead, our task is simply to determine whether the jury acted reasonably in placing its imprimatur on the plaintiff's version of events.  See Casillas-Díaz, 463 F.3d at 80-81.  Unless the evidence compels the conclusion that HEI's adverse employment actions were preplanned, our hands are tied.  See id.  We examine the record from this standpoint.

The plaintiff contends that two instances of retaliation occurred: the abolition of the SVP position (which followed on the heels of his attorney's December 4 letter alleging age discrimination) and his discharge (which followed HEI's receipt of

-11-

a copy of the MCAD charge by a matter of hours). On the record before us, we think that the jury reasonably could have found that either or both of these acts were retaliatory. We discuss them sequentially.

To begin, the jury reasonably could have found that HEI never considered the outright elimination of the plaintiff's position until after it received the December 4 letter. In this regard, we find significant the plaintiff's testimony that the abolition of his position was not mentioned either in his November conversation with Darnall or in any other discussions or correspondence preceding HEI's action. Similarly, the elimination of the SVP position was not mentioned in any internal memorandum or e-mail written in the mid-November to early December time frame. To cinch the matter, Darnall's November adjuration that the plaintiff relocate to Norwalk logically contemplated the continued existence of the SVP position (or so the jury could have found). In the same vein, the December 4 letter itself made requests that would necessitate the continued existence of the SVP post.

To be sure, HEI claims that the elimination of the SVP position was a necessary corollary of its November relocation request because it intended to offer the plaintiff a different position as a regional senior vice-president once he moved. But the jury reasonably could have found that no such intention ever existed. After all, Mendell never mentioned the regional position

during the December meeting (when he told the plaintiff that HEI was eliminating the SVP position) and, similarly, the jury could reasonably have found that neither Darnall nor any other HEI hierarch ever offered the plaintiff that position.[2]

What internal communications there were among HEI's executives also conduce to the conclusion that no firm plan had been crafted before December 4 with respect to the fate of the plaintiff's position. Indeed, some of those communications clearly envision the plaintiff as continuing to perform his SVP duties.

There is more. The jury received evidence suggesting that, in the relevant time frame, HEI's executive leadership was contemplating future acquisition and transition work that would logically have fueled an ongoing need for the SVP position. For example, Mendell established a new investment vehicle for the stated purpose of funding acquisitions in 2009 and 2010, and Darnall predicted that there might be as many as twelve acquisitions in 2009. This is especially noteworthy because, as an HEI executive affirmed: "if HEI were to acquire any new hotels in 2009 or 2010, they would need someone to work on the acquisition and transition process." The short of it is that the jury

---

[2] In a very real sense, this claim cuts against HEI's argument; if HEI had intended to offer the plaintiff the regional position (as it contends), its failure to follow through on this intention after it received the December 4 letter is an additional datum supporting the jury's finding that HEI retaliated against the plaintiff.

reasonably could have inferred that HEI's ambitious plans for the near-term acquisition of new hotel properties logically required continuation of the SVP position.

Taken in the ensemble, the evidence discussed above undercuts HEI's claim that the position-elimination decision was set in cement long before December 4.

We reach the same conclusion with respect to the plaintiff's firing on January 2, 2009. As we explain below, we believe that the jury could reasonably have concluded that this event was in retaliation for the filing of the MCAD charge.

To begin, the close temporal proximity between Mendell's receipt of the MCAD charge and his dismissal of the plaintiff — a matter of a few hours — itself supports an inference of retaliation. See Harrington v. Aggregate Indus.-Ne. Region, Inc., 668 F.3d 25, 32 (1st Cir. 2012). Here, moreover, such an inference is reinforced by other evidence in the record suggesting that negotiations were still ongoing between the parties when the axe fell. While HEI argues that everyone knew that January 2 was a "drop dead" date and that the plaintiff was aware that his employment with the company would come to a screeching halt if he did not sign the outstanding offer by then, the record is much less conclusive. A number of HEI executives indicated in e-mails sent during the critical period and in trial testimony that they thought negotiations were velivolant and would extend beyond January 2.

-14-

The plaintiff certainly labored under this impression; the January 2 transmittal letter stated unambiguously that he remained "amenable to working with HEI to arrive at a resolution." In addition, both the plaintiff's January 2 vacation alert and Darnall's tacit approval of that leave would have been superfluous had either party believed that January 2 was a "drop dead" date. This expectation of negotiations yet to come was validated by evidence of HEI's past practice of giving leeway with respect to offer letter deadlines. Finally, HEI was unable to produce any memorandum, e-mail, or other internal writing substantiating its claim that it planned all along to cashier the plaintiff if he did not sign the offer by January 2. The absence of such evidence is a factor that the jury reasonably could consider in deciding this issue. See Benders v. Bellows & Bellows, 515 F.3d 757, 763-64 (7th Cir. 2008).

HEI's principal repost is that the elimination of the SVP position and the plaintiff's subsequent discharge were the natural consequence of a path staked out well before December 4. In support, it characterizes Darnall's November conversation with the plaintiff as one in which an ultimatum was delivered. While the conversation may be susceptible to that characterization, the record contains sufficient evidence to permit a finding that it was not an ultimatum but, rather, the beginning of a dialogue about

HEI's proposed executive restructuring and the plaintiff's place in it.

So, too, the evidence permits the conclusion that HEI never intended to create any path that would lead ineluctably to the termination of the plaintiff's employment.  After all, HEI had an ongoing need for an executive with the plaintiff's expertise (or so the jury could have found); it consistently gave him sterling performance reviews; and a host of HEI executives testified that they were eager to retain his services, notwithstanding any restructuring that might take place.  It was not until the plaintiff engaged in protected activities that negotiations began to unravel.  And it was not until the filing of the MCAD charge infuriated Mendell that the plaintiff found himself out in the cold.

Let us be perfectly clear.  Although the record is susceptible to a conclusion that HEI, before any protected activity occurred, had staked out a path that committed it to the elimination of the SVP position and the plaintiff's ouster if he would not accept a demotion to the Cambridge job, the record is equally susceptible to the opposite conclusion. Because the record supports conflicting versions of the truth, it became the jury's function — not the court's — to choose between these versions.  See Noonan v. Staples, Inc., 556 F.3d 20, 30 (1st Cir. 2009). Accordingly, HEI is not entitled to judgment as a matter of law.

## B.  **Mitigation of Damages**.

HEI asserts broadly that the plaintiff failed to satisfy his obligation to mitigate damages and that, therefore, the district court erred in refusing to remit all of the damage awards on this ground.  We begin our appraisal of this assertion by remarking on the obvious: a district court has discretion to order a remittitur if such an action is warranted in light of the evidence adduced at trial.  See Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998).  In exercising this discretion, the court is obliged to impose a remittitur "only when the award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it."  Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003) (internal quotation marks omitted).  We review the grant or denial of a remittitur for abuse of discretion.  Reyes-Garcia v. Rodriguez & Del Valle, Inc., 82 F.3d 11, 14-15 (1st Cir. 1996).

A failure to mitigate damages is in the nature of an affirmative defense and the defendant, therefore, must carry the devoir of persuasion on this issue.  See Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 15-16 (1st Cir. 1999).  This requires a showing that "(i) though substantially equivalent jobs were available in the relevant geographic area, (ii) the claimant failed to use reasonable diligence to secure suitable employment."  Id. at 16;

see Black v. Sch. Comm. of Malden, 341 N.E.2d 896, 900-01 (Mass. 1976).

We agree with the district court, see Trainor II, 2012 WL 119597, at *3, that there was sufficient evidence to support a jury determination that HEI failed to carry this burden. The plaintiff testified that, in an effort to find work after the sudden termination of his employment, he networked with former employers and colleagues, canvassed the industry, and tried to exploit other contacts. He also interfaced with executive search firms, utilized available internet resources, and perused trade journals. How much is enough is generally a question of fact, and we think that a jury could reasonably have concluded — as this jury did — that no more was exigible to defeat a claim of failure to mitigate. See, e.g., Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d 549, 557 (6th Cir. 2006); Achilli v. John J. Nissen Baking Co., 989 F.2d 561, 565 (1st Cir. 1993).

HEI tries to parry this thrust by positing that the plaintiff's refusal to accept the Cambridge position necessarily betokened a failure to mitigate. But the jury could reasonably have concluded that the negotiations concerning this position were cut short by Mendell's abrupt termination of the plaintiff's employment and that, therefore, the option no longer remained open. At any rate, a plaintiff is not required to mitigate damages by accepting a position that is substantially below his wonted pay

grade and skill set.  See, e.g., Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 231-32 (1982) (holding that a claimant need not "accept a demotion" in order to mitigate damages).

To sum up, we conclude that the record contains sufficient evidence of the plaintiff's due diligence in attempting to find alternative employment to defeat HEI's claim of failure to mitigate.  Given this conclusion, we discern nothing remotely resembling an abuse of discretion in the district court's refusal to trim any of the damage awards on mitigation grounds.

### C.  **Front Pay**.

HEI makes two other arguments directed at the district court's failure to remit the jury's front pay award.  We consider these arguments separately.

1.  **Availability**.  In what is logically a threshold argument, HEI challenges the availability of front pay as a matter of law.  Because this challenge raises a purely legal question, it engenders de novo review.  See Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010).

The centerpiece of HEI's argument is the proposition that, as a matter of law, front pay is not available when a plaintiff has received the benefit of an award of double or treble damages.  This proposition is all bleat and no wool.

HEI claims that this proposition is venerated in First Circuit precedent.  This claim is specious.  The seminal case on

which HEI relies is Wildman v. Lerner Stores Corp., 771 F.2d 605 (1st Cir. 1985). There, the plaintiff had received an award of double damages and the district court had denied front pay. Id. at 616. While we affirmed the denial of front pay, our decision in no way hinted, let alone held, that multiplied damages and front pay are mutually exclusive. Rather, we based our ruling on the wide discretion vested in the district court with respect to awards of front pay — a discretion that could be exercised to take account of the inherently speculative nature of front pay. See id.; see also Lussier v. Runyon, 50 F.3d 1103, 1109 (1st Cir. 1995) (discussing Wildman); Powers v. Grinnell Corp., 915 F.2d 34, 42-43 (1st Cir. 1990) (same). This same principle animated our decisions in the other cases highlighted by HEI. See, e.g., Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 67 (1st Cir. 2005); Carey v. Mt. Desert Island Hosp., 156 F.3d 31, 40-41 (1st Cir. 1998).

In any event, the cases upon which HEI relies strike a common chord. In each of them, the district court denied front pay,[3] and we upheld that denial. See, e.g., Rodriguez-Torres, 399 F.3d at 67; Carey, 156 F.3d at 40-41. By their own terms, those

---

[3] In many situations, front pay is an equitable remedy rather than an element of damages. See Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 380 (1st Cir. 2004). Here, however, the parties and the district court treated front pay as an element of damages to be submitted to the jury. Neither party has suggested that the court, rather than the jury, should have been the arbiter of front pay in the first instance. Thus, we do not pursue the point further.

decisions are inapposite to the case at hand, in which we are asked to set aside a ruling <u>upholding</u> an award of front pay.

If more were needed — and we doubt that it is — the purposes of front pay and multiplied damages are so disparate that a per se rule of mutual exclusivity makes no sense. The purpose of a front pay award is to help to make a plaintiff whole. <u>Lussier</u>, 50 F.3d at 1112 n.10. Conversely, multiplication of damages, at least under Mass. Gen. Laws ch. 151B, § 9, is "essentially punitive in nature." <u>Fontaine</u> v. <u>Ebtec Corp.</u>, 613 N.E.2d 881, 889 (Mass. 1993) (internal quotation marks omitted). In other words, the multiplication factor is meant to punish the wrongdoer for egregious conduct. It follows that there is no principled basis to bar front pay simply because multiplied damages are in prospect.

Since HEI's argument for precluding front pay as a matter of law is premised on an incorrect reading of the cases and is jurisprudentially unsound, we reject it.

2. **<u>Evidentiary Sufficiency</u>**. In declining to remit the front pay award, the district court concluded that the plaintiff would have worked at HEI until the end of 2013 (or so the jury could have found). <u>See</u> <u>Trainor II</u>, 2012 WL 119597, at *4. HEI insists that there was insufficient evidence to support a rational conclusion that, absent the plaintiff's unlawful termination, he would have worked at HEI through 2013. Addressing this challenge

-21-

requires us to take the evidence bearing on front pay in the light most favorable to the plaintiff.  See Kelley, 140 F.3d at 355.

In the last analysis, a front pay calculation is a prediction of a series of future events.  To that extent, crafting a front pay award necessarily entails some degree of speculation.  See Lussier, 50 F.3d at 1109.  Here, however, the task of vaticination is made simpler by the plaintiff's age: at the time of trial (March of 2011), the plaintiff was 63 years old.  This means that his normal retirement year (age 65) was only two years away.  Moreover, there was no evidence of any corporate policy mandating early retirement.

The plaintiff testified flatly that he intended to work at HEI until the end of 2013.  This statement of intent was supported by circumstantial evidence; his professed work expectancy was coterminous with both the year of his eligibility for full Social Security benefits and the year in which he would vest at the 80% level in the last of HEI's investment funds.  Based on this testimony, the jury's forecast of the emoluments that this three-year period would yield was reasonable.

In an effort to undermine the plaintiff's testimony on this point, HEI proffered evidence suggesting that the pace of its acquisitions had slowed beginning in 2009.  Thus, the company might not have been able to justify the SVP position on a going-forward basis.  But this evidence was not compelling; the jury also heard

evidence that HEI not only had plans for growth but also had the capital needed to implement those plans. What is more, the SVP position included responsibilities beyond those arising out of acquisitions and transitions. There is no reason to believe that those responsibilities were made irrelevant by the passage of time.

Choosing between competing inferences that plausibly can be drawn from a body of evidence is principally a task for the factfinder. See Noonan, 556 F.3d at 30. Drawing all reasonable inferences in favor of the verdict, see Casillas-Díaz, 463 F.3d at 79, we conclude, without serious question, that the evidence was sufficient to support the jury's award of front pay through 2013.

### D. **Emotional Distress**.

Despite the fact that the district court cut the award of emotional distress damages in half (from $1,000,000 to $500,000), HEI maintains that even the reduced amount is grossly excessive. We approach this inquiry mindful that "translating legal damage into money damages — especially in cases which involve few significant items of measurable economic loss — is a matter peculiarly within a jury's ken." Sanchez v. P.R. Oil Co., 37 F.3d 712, 723 (1st Cir. 1994) (alteration and internal quotation marks omitted). This is not to say, however, that emotional distress damages are immune from judicial review. They are not. See, e.g., Koster v. Trans World Airlines, Inc., 181 F.3d 24, 34 (1st Cir. 1999). But judicial review of such awards is circumspect — and

that review is even more constrained where, as here, the trial court has already pared the original jury award. See Sanchez, 37 F.3d at 723-24. Further relief is not warranted unless the award, as remitted, remains "so extravagant as to shock the appellate conscience." Id. at 724; see Conde v. Starlight I, Inc., 103 F.3d 210, 214-16 (1st Cir. 1997) (remitting a previously remitted award of damages for future lost income); Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 773-75 (3d Cir. 1987) (remitting a previously remitted award of emotional distress damages).

In this case, it cannot be gainsaid that the plaintiff suffered emotionally by reason of his firing. Both he and his wife vouchsafed that the abrupt termination of his relationship with HEI changed him as a person; he became withdrawn and lost interest in activities that formerly gave him pleasure. His wife added that, up until his firing, he had always enjoyed his work in the hotel industry and found his job rewarding. Moreover, the damming of his income stream forced him to deplete his retirement savings, and he became greatly concerned about his family's financial security. These vicissitudes, in turn, put a strain on his marriage.

Even so, the plaintiff did not introduce any evidence that he received medical treatment, counseling, or other similar attention for his despondency. While evidence from a physician or other mental health professional is not a sine qua non to an award of damages for emotional distress, the absence of such evidence is

-24-

relevant in assessing the amount of such an award.  See Koster, 181 F.3d at 35.  Here, moreover, the plaintiff proffered no evidence that he suffered any physical infirmity as a result of his ouster. The only relevant evidence is anecdotal and, to some extent, self-serving.

We do not mean to minimize the toll that the loss of a job can take, even apart from serious health concerns.  Here, however, the evidence of emotional distress is so thin that the remitted award of $500,000 seems vastly out of proportion.  We hold, therefore, that a further remittitur is required.

As a part of our decisional calculus, we have looked to awards in comparable cases.  Although our central focus in reviewing an award of damages must be the evidence in the case subjudice, see Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 579 (1st Cir. 1989), "[a]wards in comparable cases are instructive," Aponte-Rivera v. DHL Solutions (USA), Inc., 650 F.3d 803, 811 (1st Cir. 2011).  A review of cases with comparable facts corroborates our conclusion that $500,000 is grossly excessive here.  See, e.g., Aponte-Rivera, 650 F.3d at 811-12 (upholding a district court's remittitur of emotional distress damages to $200,000 where employee, although experiencing some distress due to discrimination, did not introduce testimony by medical experts, experienced no "outward manifestations of emotional distress," and did not undergo long-term depression or medical treatment (internal

quotation marks omitted)); <u>Rodriquez-Torres</u>, 399 F.3d at 63-64 (upholding a $250,000 award of damages for emotional distress where plaintiff experienced a drastic life change, financial difficulties, marital problems, and depression).

This brings us to the question of what the award should be. This court adheres to the "maximum recovery rule," which permits us to direct a remittitur geared to the maximum recovery for which there is evidentiary support (subject, of course, to the plaintiff's right to reject the remittitur and instead elect a new trial on the disputed damages claim). <u>See</u> <u>Koster</u>, 181 F.3d at 36. After a careful review of the record and a compendium of analogous cases, we conclude that the upper limit of the universe of reasonable outcomes — the plaintiff's maximum recovery — is $200,000. Consequently, we remand to the district court with directions to vacate the award of $500,000 for emotional distress and order a new trial on that issue unless the plaintiff agrees to accept a further remittitur of $300,000. Once the plaintiff takes a position as to remittitur, the district court should revise its previous doubling of damages accordingly.

### E. <u>The Multiplication Order</u>.

The district court submitted the case to the jury by means of a special verdict form, <u>see</u> Fed. R. Civ. P. 49(a), and the jury accompanied its finding of retaliation with a special finding that HEI knew or had reason to know that its retaliatory actions

violated state law. Based on this special finding, the court doubled the damages award. See Trainor I, 2011 WL 1670234. HEI assigns error to this ruling.

Massachusetts law provides for double damages in an age discrimination case (including a retaliation case) if "the act or practice complained of was committed with knowledge, or [the defendant had] reason to know, that such act or practice violated [Mass. Gen. Laws ch. 151B, § 4]." See Mass. Gen. Laws ch. 151B, § 9. The special finding upon which the district court relied was tailored to this standard.

The primary thrust of HEI's assignment of error is that this special finding is inconsistent with another special finding memorializing the jury's conclusion that HEI had not willfully violated federal law. HEI contends that the standards underlying the two questions — knowingly violating Massachusetts law and willfully violating federal law — are effectively the same and that, therefore, the special findings are inconsistent. HEI first raised this contention in a post-trial motion, and the district court rebuffed it on the ground that no inconsistency existed. Trainor II, 2012 WL 119597, at *7.

We need not linger long over HEI's ipse dixit. HEI waived its right to challenge the alleged inconsistency because it failed to mount a timely objection. When the jury returned with an affirmative answer to the question about knowing violation of state

-27-

law and a negative answer to the question about willful violation of federal law, HEI had both an opportunity and an obligation to point out any inconsistency. Yet, HEI did nothing; its counsel sat silent and did not call the district court's attention to the matter. The first time that HEI saw fit to mention any alleged inconsistency was when it filed its post-trial motions (well after the court had awarded double damages and dismissed the jury).

Courts, like the Deity, tend to help those who take steps to help themselves. So it is here: with respect to special verdicts, "[t]he law is perfectly clear that [parties] . . . waive[] any claim of internal inconsistency by failing to object after the verdict [is] read and before the jury [is] discharged." Peckham v. Cont'l Cas. Ins. Co., 895 F.2d 830, 836 (1st Cir. 1990) (internal quotation marks omitted). We have described this rule as "iron-clad." Wennik v. Polygram Grp. Distrib., Inc., 304 F.3d 123, 130 (1st Cir. 2002). The resultant waiver forecloses HEI from challenging the court's multiplication of damages based on any purported inconsistency between the two special findings.

In an effort to escape from the consequences of its waiver, HEI suggests that because the verdict in this case was returned pursuant to Federal Rule of Civil Procedure 49(a), it had no duty to call the inconsistency to the district court's attention

prior to the jury's discharge.[4]  This suggestion flies in the teeth

of settled precedent in this circuit.  See, e.g., Andrade v.

Jamestown Hous. Auth., 82 F.3d 1179, 1189 (1st Cir. 1996); Peckham,

895 F.2d at 836 (holding that party waived its right to object to

inconsistency in context of Rule 49(a) special verdict).[5]

---

[4] Rule 49(a)(1) provides that:

> The court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact. The court may do so by:
>
> (A) submitting written questions susceptible of a categorical or other brief answer;
>
> (B) submitting written forms of the special findings that might properly be made under the pleadings and evidence; or
>
> (C) using any other method that the court considers appropriate.

Fed. R. Civ. P. 49(a).

[5] We recognize that this Rule 49(a) waiver issue has split the circuits.  See 9 James Wm. Moore, Moore's Federal Practice § 49.11[6] (2012) (collecting cases). In creating this split, some courts have held that no waiver arises despite the failure to object to a putative inconsistency before the jury leaves the box. See, e.g., Pierce v. S. Pac. Transp. Co., 823 F.2d 1366, 1370 (9th Cir. 1987); Ladnier v. Murray, 769 F.2d 195, 198 & n.3 (4th Cir. 1985).  But we are "firmly bound" by past panel holdings in this circuit, United States v. Clark, 685 F.3d 72, 79 (1st Cir. 2012), and therefore must adhere to our own precedent.  This body of precedent inarguably requires that parties object to verdict inconsistencies prior to the jury's discharge on penalty of waiver. See, e.g., Jamestown Hous. Auth., 82 F.3d at 1189; Coastal Fuels of P.R. v. Caribbean Petroleum Corp., 79 F.3d 182, 201-02 (1st Cir. 1996); Peckham, 895 F.2d at 836.

HEI also argues that it cannot be charged with a waiver because, when the jury returned its verdict, the district court never inquired as to whether any party wished to comment. This argument is untenable. It is the obligation of a litigant to bring a question of verdict inconsistency to the court's attention, not the other way around. See, e.g., Austin v. Lincoln Equip. Assocs., Inc., 888 F.2d 934, 939 (1st Cir. 1989). As we have said in a different context, "[t]he law ministers to the vigilant not to those who sleep upon perceptible rights." Puleio v. Vose, 830 F.2d 1197, 1203 (1st Cir. 1987).

That ends this aspect of the matter. Given HEI's waiver, it is not necessary for us to pursue the merits of HEI's inconsistency argument.[6]

## F. **Attorneys' Fees**.

After the jury verdict, the lower court determined that the plaintiff, as a prevailing party, was entitled to attorneys' fees under both federal and state law. See 29 U.S.C. §§ 216(b), 626(b); Mass. Gen. Laws ch. 151B, § 9. The court proceeded to

---

[6] We note in passing that HEI's claim that the answers are inconsistent is in the nature of a deathbed conversion. In both its proposed jury instructions and its proposed special verdict form, HEI asked the district court to treat separately the issues of knowing violation of state law and willful violation of federal law. Moreover, HEI lodged no objection to the court's submission of the two questions to the jury as separate and distinct matters. Setting aside the verdict on the basis of a belated claim of inconsistency would appear to "place a premium on agreeable acquiescence to perceivable error as a weapon of appellate advocacy." Merchant v. Ruhle, 740 F.2d 86, 92 (1st Cir. 1984).

-30-

compute the time productively spent by the plaintiff's lawyers, applied reasonable hourly rates, performed a lodestar calculation, and awarded the plaintiff $533,553.15 in fees.[7]  Trainor II, 2012 WL 119597, at *8-14.  HEI challenges the fee award on only a single ground: the inclusion of hours spent with respect to the unsuccessful age discrimination claim.

We limit our discussion to cases — like this one — to which fee-shifting statutes pertain.  Even then, however, plaintiffs generally may not recover attorneys' fees on unsuccessful claims.  See Hensley v. Eckerhart, 461 U.S. 424, 440 (1983); Lipsett v. Blanco, 975 F.2d 934, 940 (1st Cir. 1992).  But this generalization — like virtually every generalization — admits of exceptions.  One such exception holds that attorneys' fees may be awarded with respect to work performed on unsuccessful claims if those claims are interrelated with successful claims.  Lipsett, 975 F.2d at 940; Aubin v. Fudala, 782 F.2d 287, 291 (1st Cir. 1986) (Breyer, J.).  Thus, if an unsuccessful claim includes "a common core of facts" or is premised on a "related legal theor[y] linking [it] to the successful claim," the award "may include compensation for legal work performed on the unsuccessful claim[]."  Garrity v. Sununu, 752 F.2d 727, 734 (1st Cir. 1984) (internal quotation marks omitted).

---

[7] This award included expenses.  For ease in exposition, we refer only to attorneys' fees, subsuming expenses within this rubric.

We review a district court's award of attorneys' fees for abuse of discretion. See Spooner v. EEN, Inc., 644 F.3d 62, 66 (1st Cir. 2011). A material error of law is, of course, an abuse of discretion. See id. When passing upon the interrelatedness of claims, we have ceded particularly great respect to the trial court's views. "This deference is motivated by our conviction that the decision as to how to separate the wheat from the chaff in a fees contest, within broad limits, is a matter for the district court's discretion." Lipsett, 975 F.2d at 941 (internal quotation marks omitted).

Applying this deferential standard of review, we discern no misuse of discretion in the district court's refusal to exclude the time committed to the age discrimination claim. The court plausibly reasoned that the successful retaliation claim and the unsuccessful age discrimination claim shared a common legal theory. Trainor II, 2012 WL 119597, at *9. In order to succeed on the retaliation claim, the plaintiff had to prove, in the parlance of the jury instructions, that he "reasonably and in good faith believed that HEI was engaged in discrimination [based on age]." Seen in this light, work performed on the age discrimination claim was intertwined with, and contributed materially to, the eventual success of the retaliation claim. Mindful of this interconnectedness, it would be "difficult to divide the hours expended on a claim-by-claim basis." Hensley, 461 U.S. at 435.

HEI resists this conclusion, expostulating that the retaliation claim relied only on the testimony of a few individuals and, thus, made the work performed on the two claims susceptible to easy separation. This expostulation glosses over the district court's finding of interrelatedness predicated on the need to make a good faith showing of likely age discrimination in order to prevail on the retaliation claim. While it might be possible to parse the record in the way that HEI suggests, this possibility is of no consequence due to the district court's supportable finding that a sufficient nexus existed between the successful retaliation claim and the unsuccessful age discrimination claim.

We add that "[w]hen interrelatedness is in question, the overall degree of the prevailing party's success is an important datum." Lipsett, 975 F.2d at 941. In this litigation, the plaintiff achieved what only can be described as a smashing success and, therefore, he should "recover a fully compensatory fee." Hensley, 461 U.S. at 435.

For these reasons, the district court did not abuse its discretion when it refused to exclude from the fee award time related to the prosecution of the unsuccessful age discrimination claim. See Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 517-18 (9th Cir. 2000) (finding retaliation claims "inextricably intertwined" with discrimination claims for purposes of an interconnectedness analysis).

-33-

## G. **Equitable Relief**.

HEI's final plaint concerns the district court's post-trial order, which allows the plaintiff a right to participate and vest in the three company-sponsored investment funds. To place this peevish plaint into proper perspective, we limn the background.

When HEI initially recruited the plaintiff, it offered him the opportunity — consistent with its praxis vis-à-vis selected senior executives — to participate in certain company-sponsored investment funds. Two such funds existed at the time (Funds I and II), and HEI developed a third in 2008 (Fund III). These private equity funds serve a dual purpose. First, they are designed to furnish a source of fresh capital for HEI's continued growth. Second, they provide both an investment opportunity and a profit-sharing vehicle for investor-employees.

The trial record does not contain the actual documentation for Funds I, II, or III. The parties, however, have offered summary descriptions of how the funds operate. It appears that, once an investor-employee receives a return of his equity plus a cumulative six percent return, he has a right to share in excess returns generated by the fund as a whole (called "promote funds"). An employee's right to receive promote funds vests according to a set schedule. To the extent that an investor-employee leaves HEI before fully vesting in a particular fund, his

unvested share of promote funds is forfeited and redistributed within the fund.

At the time of his dismissal, the plaintiff had invested $50,000 in Fund I and $50,000 in Fund II. He also had subscribed a like amount for Fund III, but had not paid the entire subscription price because an outstanding balance had not been called.

The opportunity to participate in these investment vehicles was much coveted and viewed as a fringe benefit (and, thus, as part of an executive's compensation package). HEI made the opportunity available only to selected employees — a grouping that included the plaintiff. The promise that he could participate in the funds was a critical factor in the plaintiff's decision to join HEI.

When HEI showed him the door, the plaintiff stood to lose his right to participate fully in Fund III and to earn the full extent of the promote funds. Consequently, he sought an injunction to allow him to fulfill his subscription to Fund III and to continue vesting in all the promote funds. As both sides in this litigation agree, equitable relief of this sort is reserved for the court. See Sharkey v. Lasmo (AUL Ltd.), 214 F.3d 371, 373-75 (2d Cir. 2000). The district court granted equitable relief: it allowed the plaintiff to continue vesting in all three funds as though he were employed by HEI through January of 2014, and ordered

HEI to treat the plaintiff during that interval as any other executive still participating in the funds. Trainor III, 2012 WL 113384. With respect to Fund III, the court conditioned the relief granted on the plaintiff's timely completion of his subscription when and as future capital calls were made. Id.

In appealing this order, HEI asserts that the order contravenes the contractual provision that halts vesting and disallows further participation in the funds upon termination of employment. Notwithstanding this contractual term, we conclude that the challenged order is within the scope of the district court's broad power to make a prevailing plaintiff whole.

"[W]e review a district court's choice of equitable remedies for abuse of discretion . . . ." Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 323 (1st Cir. 1989) (en banc). We will not set such an order aside unless "we are left with a firm conviction that [the court] has committed a meaningful error in judgment." Id. (internal quotation marks omitted).

Under both the federal and state laws governing age discrimination cases (including retaliation cases), prevailing plaintiffs are entitled not only to money damages but also to injunctive relief where appropriate. See 29 U.S.C. § 626(b) ("In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate . . . ."); Mass. Gen. Laws ch. 151B, § 9 (stating that,

in employment discrimination cases, a plaintiff may sue for "damages or injunctive relief or both").  Under both regimes, the trial court is ceded wide discretion to make a prevailing plaintiff whole.  See Albemarle Paper Co. v. Moody, 422 U.S. 405, 418-19 (1975); Bournewood Hosp., Inc. v. MCAD, 358 N.E.2d 235, 242 (Mass. 1976).

We decry no abuse of discretion here.  The plaintiff considered his right to participate fully in the company-sponsored investment funds as part of his compensation package and, at least in part, he planned his retirement around his vesting schedule. The plaintiff's expectations were reasonable under the circumstances.  The district court saw the funds for what they were and, in order to make the plaintiff whole, it appropriately ordered HEI to continue to treat him, for a finite period, as if he had not been wrongfully discharged.

The relief that the district court granted is not unorthodox.  Both parties agree that HEI's investment funds are analogous to pension plans.  Equitable relief to maintain pension plan benefits is within the universe of options available to a district court in its effort to ensure that a plaintiff is made whole.  See, e.g., Banks v. Travelers Cos., 180 F.3d 358, 365 (2d Cir. 1999) (explaining that reinstating pension rights falls within the panoply of available equitable remedies); Geller v. Markham, 635 F.2d 1027, 1036 (2d Cir. 1980) (similar).

Employees who — like the plaintiff — are near the endpoint of their normal work expectancy are especially vulnerable to the loss of retirement benefits. Where, as here, such an employee is unlawfully discharged, the district court has both the authority and the discretion to grant equitable relief to make him whole. The lower court's exercise of this authority in the case at hand is well within the bounds of that discretion.[8]

## III. CONCLUSION

This case was tried cleverly, by skilled counsel on both sides, before an able judge and an impartial jury. The briefs on appeal are stellar. When all is said and done, however, the record is freighted with ambiguities. The jury resolved those ambiguities in favor of the plaintiff. Doing so was the jury's prerogative — indeed, its duty — and we cannot disturb the jury's resolution unless the record compels a contrary conclusion. With the lone exception that we have noted, it does not.

We need go no further. For the reasons elucidated in the foregoing pages, we affirm the judgment below, with only a single exception: we vacate the previously remitted award of emotional distress damages and direct the district court to order the plaintiff either to remit all of that award in excess of $200,000

---

[8] In resisting the order for equitable relief, HEI repeats its argument that the December 31, 2013 retirement date is based on speculation. We already have examined this argument and found it wanting, see supra Part II(C)(2), and it would serve no useful purpose to repastinate this well-plowed soil.

or else undergo a new trial on that issue.  The district court also must adjust its award of multiplied damages to reflect the plaintiff's response to this remittitur.

**Affirmed in part, vacated in part, and remanded.  Two-thirds costs shall be taxed in favor of the plaintiff.**