# United States Court of Appeals
## For the First Circuit

No. 12-2442

LAURA CLIMENT-GARCÍA,

Plaintiff, Appellee,

v.

AUTORIDAD DE TRANSPORTE MARÍTIMO Y LAS ISLAS MUNICIPIO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Bruce J. McGiverin, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Aníbal J. Núñez-González and Puerto Rico Legal Advocates, PSC, on brief for appellant.
Francisco M. Troncoso, Law Offices of Francisco M. Troncoso, PSC, and Jorge L. Guerrero-Calderón, on brief for appellee.

May 16, 2014

**TORRUELLA, Circuit Judge.** Laura Climent-García ("Climent") sued her employer, alleging adverse employment action and a failure to hire on account of sex. A jury found in favor of Climent on both counts. On appeal, the Autoridad de Transporte Marítimo y la Islas Municipio (the Puerto Rican Maritime Transport Authority or "the MTA") seeks a reversal of the jury verdict, claiming that insufficient evidence was presented at trial to support the jury's findings. In the alternative, the MTA requests remittitur on the issue of damages. Because a procedural misstep bars its sufficiency-of-the-evidence claim from review, we do not consider that portion of the MTA's appeal. As to the damages award, after a thorough review of the evidence, we affirm the district court's denial of remittitur.

## I. Background

Because the MTA's claims rest on sufficiency-of-the-evidence grounds, we recite the facts in the light most favorable to the jury's verdict. See Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 30 n.1 (1st. Cir. 2011); Correa v. Hosp. S.F., 69 F.3d 1184, 1188 (1st Cir. 1995).

### A. Climent's Employment

At all times relevant to this case, Climent held the permanent position of Operations Supervisor at the MTA's Fajardo, Puerto Rico, ferry terminal. In this position, her monthly salary was $2,810, and she was eligible for overtime.

-2-

In 2006, the Executive Director of the MTA, Juan Cirino-Martínez ("Cirino"), approached Climent about her serving, on an interim basis, as the Assistant Manager of Maritime Transport at the Fajardo ferry terminal. She accepted the position. As Interim Assistant Manager, Climent's responsibilities included overseeing all operational and administrative aspects of ferry operations between Fajardo and the two offshore islands of Culebra and Vieques, Puerto Rico. Many of her duties, such as managing the ticket office, inspecting cargo loads, and ensuring vessel maintenance, required Climent to be present at the Fajardo ferry terminal.

Due to these on-site duties, Climent's male predecessor had worked from an office at the ferry terminal. She, however, was given office space at an MTA-owned location approximately ten minutes away. On several occasions when Climent traveled to the terminal to complete her work, Cirino -- either directly or through an intermediary -- would forcefully demand that she return to her office. As a result, Climent had less of an operational role than her predecessor, and administrative tasks comprised a relatively larger share of her duties.

Climent also noticed that her predecessor continued to sign certain requisition and disbursement orders. Believing that having multiple signatories on orders for a single ferry would cause confusion, Climent stopped signing orders related to

-3-

particular vessels.  On one occasion, Cirino became angry when he realized Climent had not signed an order, screaming at her and insinuating that she would soon be fired.  Climent, upset and in tears, returned to her office and spoke to the MTA's Human Resources Director, Jeanette Santana ("Santana").  She later met with a psychologist to alleviate her distress.

In July 2007, upset with her treatment in Fajardo, Climent resigned from the Interim Assistant Manager position, returned to her permanent job as Operations Supervisor, and began to investigate the possibility of transferring to a different location.  Around that same time, an interim position of Maritime Transport Administrator opened up at the AcuaExpresso ferry terminal in San Juan, Puerto Rico.  Santana recommended Climent for the job, telling Cirino that she believed Climent was highly qualified.  Cirino expressed skepticism, suggesting that Climent's childcare responsibilities would make commuting from Fajardo to San Juan for work inappropriate.  Overhearing this conversation, Climent responded that she would happily make appropriate childcare arrangements and that she wished to be considered for the position.  Again, Cirino refused, saying that the San Juan ferry terminal was staffed only by males and that he had already selected a different individual, Stanley Mulero ("Mulero"), for the position.

While Maritime Transport Administrator, Mulero received a monthly salary of $4,342 and was not eligible for overtime.

Having not been selected for the position, Climent continued to work as Operations Supervisor in Fajardo, where she remained employed throughout this litigation.

**B. The Trial**

Climent brought claims pursuant to Title VII, 42 U.S.C. §§ 2000e et seq., and analogous Puerto Rico law, Law No. 100 of June 30, 1959, as amended, P.R. Laws Ann. tit. 29, §§ 146 et seq. ("Law 100"). Trial began on September 19, 2012. During the jury trial, the MTA twice moved for judgment as a matter of law, see Fed. R. Civ. P. 50, first, at the conclusion of Climent's case-in-chief and, second, after the close of all evidence. The magistrate judge presiding over the trial declined to grant either motion.

After deliberations, on September 27, 2012, the jury returned a verdict for Climent on both counts. For her adverse employment action claim, which was related to her time as Interim Assistant Manager in Fajardo, the jury awarded $50,000 in compensatory damages. For her failure to hire claim, which was related to the Maritime Transportation Administrator position in San Juan, the jury awarded $95,750 in back pay. Pursuant to Law 100, the magistrate judge doubled this total award, entering judgment against the MTA in the amount of $291,500. The MTA filed a post-verdict motion under Federal Rule of Civil Procedure 59(e), seeking a reduction of the damages award. It did not renew its

motion for judgment as a matter of law. The magistrate judge declined to reconsider damages, and this appeal followed.

## II. Discussion

### A. Sufficiency of the Evidence

The MTA seeks a reversal of the jury verdict, arguing that no reasonable jury presented with the evidence at trial could have found either an adverse employment action or a failure to hire. The tide runs strongly against a litigant seeking to overturn a jury verdict. See, e.g., Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 22 (1st Cir. 2006) ("In assessing the sufficiency of the evidence to support a jury verdict, we ask whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found in favor of the party that prevailed."); Crowley v. L.L. Bean, LLC, 303 F.3d 387, 393 (1st Cir. 2002) ("Our review . . . 'is weighted toward preservation of the jury verdict,' for 'we must affirm unless the evidence was so strongly and overwhelmingly inconsistent with the verdicts that no reasonable jury could have returned them.'" (quoting Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41–42 (1st Cir. 2002))).

In order to engender appellate review on sufficiency-of-the-evidence grounds, however, "a party must first have presented the claim to the district court, either by moving for judgment as a matter of law before the case is submitted to the jury and renewing that motion after the verdict or by moving for a new

trial."  Hammond v. T.J. Litle & Co., 82 F.3d 1166, 1171 (1st Cir. 1996) (emphasis added and internal citation omitted).  Despite having twice filed for judgment as a matter of law during trial, the MTA failed to renew this motion post-verdict.  That failure leaves the MTA's claim dead in the water, for an appellate court "'cannot review the denial of a Rule 50(a) motion based on the sufficiency of the evidence when the party appealing the verdict failed to renew its sufficiency challenge in the district court pursuant to Rule 50(b).'"  Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 32 (1st Cir. 2007) (quoting Vázquez-Valentín v. Santiago-Díaz, 459 F.3d 144, 148 (1st. Cir. 2006)); see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 407 (2006) ("[S]ince respondent failed to renew its preverdict motion as specified in Rule 50(b), there was no basis for review of respondent's sufficiency of the evidence challenge in the Court of Appeals.").

Although the MTA did file a post-verdict motion to amend or alter the judgment pursuant to Fed. R. Civ. P. 59(e), that is of no help to their claim.  We have previously explained that when a party files a motion under Federal Rule of Civil Procedure 59(a) for a new trial on evidentiary grounds, it may be the benefactor of a "limited review of the sufficiency claim," insofar as that review is required to assess the merits of its new trial request.  Jusino v. Zayas, 875 F.2d 986, 991 (1st Cir. 1989).  We have made clear, however, that a post-verdict Rule 59 motion seeking other relief --

including the reduction of damages -- cannot preserve a party's sufficiency claim for appellate review.  Id. at 992 ("Although [appellant] filed a posttrial motion under Rule 59(e), that motion did not challenge the adequacy of the evidence generally, but dealt solely with the matter of double damages . . . .  [A]ppellants neglected seasonably to invoke either Rule 50 or Rule 59(a) on sufficiency grounds.").  Here, the MTA did not argue in its post-verdict motion that there was insufficient evidence of liability on either the adverse employment action or the failure to hire claim.

In light of its failure to file a post-verdict Rule 50(b) motion, we do not consider the MTA's unpreserved challenge to the sufficiency of the evidence.  That ship has sailed.

## B. Damages Amount

The MTA also appeals from the district court's denial of its Rule 59(e) motion for remittitur.  It is within the district court's discretion "to order a remittitur if such an action is warranted in light of the evidence adduced at trial."  Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 29 (1st Cir. 2012) (citing Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998)).  To warrant remittitur, however, the award must exceed "any rational appraisal or estimate of the damages that could be based upon the evidence before it."  Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003) (internal quotation marks omitted) (quoting E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d

492, 502 (1st Cir. 1994)); see also Smith v. Kmart Corp, 177 F.3d 19, 29 (1st Cir. 1999).[1]

Where a district court has entered or denied a remittitur under this standard, our review is for abuse of discretion. Trainor, 699 F.3d at 29; Smith, 177 F.3d at 29. In undertaking this review, we assess the evidence in the light most favorable to the jury's award, drawing all reasonable inferences in support of the award. Smith, 177 F.3d at 21; Conde v. Starlight I, Inc., 103 F.3d 210, 214 (1st Cir. 1997).

The MTA does not challenge the $50,000 in compensatory damages. In addition, although its Rule 59(e) motion questioned the appropriateness of double damages under Law 100, that claim was not renewed on appeal. Thus, at issue is only the back pay award of $95,750.[2] The MTA attacks this amount on two grounds. First,

[1] In cases of noneconomic injury, such as emotional distress, remittitur requires further finding that the award "is so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law." Koster v. Trans World Airlines, Inc., 181 F.3d 24, 34 (1st Cir. 1999); see also Kolb v. Goldring, Inc., 694 F.2d 869, 871 (1st Cir. 1982) (explaining the distinct standards applicable to damages of a noneconomic versus economic nature).

[2] The record does not expressly indicate how the jury calculated this amount, and neither party addresses the issue. Based on a few uncontested facts, however, we can recreate at least one rational way the jury might have reached this number: (1) Climent's salary was $2,810 per month; (2) Mulero's salary was $4,342 per month; (3) Mulero began as Maritime Transport Administrator on July 16, 2007; (4) the jury returned its verdict on September 27, 2012. Extrapolating from these facts, the jury might rationally have calculated Climent's lost monthly salary as $1,532 ($4,342 - $2,810 = $1,532) and awarded damages from the date Mulero began work until

it argues that Mulero only served as Maritime Transportation Administrator for fourteen months, from July 2007 until September 2008. This fourteen-month period, according to the MTA, should be the maximum duration for which Climent is eligible to receive back pay based on the failure to hire her to an interim position. Second, the MTA argues that the back pay award failed to account for Climent's overtime wages. It asserts that, with overtime, she made more than $4,432 for at least nine of the fourteen months in question.

Back pay is intended to "fully compensate a plaintiff in a manner that suits the specific facts of the case." Selgas v. Am. Airlines, Inc., 104 F.3d 9, 12-13 (1st Cir. 1997); see also Albemarle Paper Co. v. Moody, 422 U.S. 405, 419 (1975) (stating that back pay should be in the amount necessary to make a plaintiff whole). In cases where the evidence presented at trial shows damages to be limited in duration or offset by alternative income, therefore, remittitur may be appropriate to avoid granting the plaintiff a significant windfall. The MTA, however, is incorrect in asserting that this is such a case. Reviewing all the facts on the record, we explain the shortcomings of each of its claims in turn.

---

the entry of judgment (62.5 months). Simple multiplication gives us the total back pay award ($1,532 x 62.5 = $95,750).

## 1. Duration of the Interim Position

In both its Rule 59(e) motion and again on appeal, the MTA alleges that "Mulero declared at trial that the interim post lasted fourteen (14) months." Because the parties do not contest that the position was interim in nature, the MTA concludes that this fourteen-month period is the maximum time for which Climent could receive damages.

Having reviewed the record, it is clear that this argument significantly mischaracterizes Mulero's testimony. The only time he mentions a fourteen-month period is during a discussion of a merit-based raise:

> Q: . . . [Cirino] gave you some steps, some merit steps? Is that correct?
> A: Yes. That's correct. After 14 months as interim [] maritime transport administrator, pursuant to the regulations, he granted me some merits steps.

This language alone does not show when (or even if) Mulero left the Maritime Transportation Administrator position, only that after fourteen months he was given a raise. More tellingly, nothing else in the record establishes that the position, although interim in nature, had a predetermined end date. For example, the letter appointing Mulero, which was introduced as a trial exhibit, states only that his job would commence on July 16, 2007, but does not indicate how long it would last.

Testimony regarding the nature of interim posts at the MTA further underscores this point. Climent, for example, testified

that "[a]n interim position is a position in which [I would] cover someone else for a fixed period of time and at the end of the determined <u>or undetermined period</u> . . . I would then return to my position as supervisor."  Similarly, Santana testified that an employee may be "appoint[ed] in a position on an interim basis and once the executive director, the nominating authority or the employee themselves request that the appointment be terminated, the person returns to their career position."  These statements accord with other testimony clearly establishing that, although understood by MTA employees to be temporary in nature, the duration of an interim post may be indefinite or undetermined.

The record does establish that Mulero eventually left his post as Maritime Transportation Administrator, but it offers no clue as to when, precisely, this departure occurred or whether it coincided with the end of the interim posting.  In other words, the record is bereft of any evidence that would require the jury to determine that, had Climent been awarded the position, she (1) would have ended her interim tenure on the same date as Mulero, or (2) could not have served as Maritime Transportation Administrator until the time of trial.  As such, we are unconvinced that the damages calculation was clearly irrational, or that the district court abused its discretion in denying the motion for remittitur on this ground.

**2. Overtime Pay**

Taking a different tack, the MTA next claims that the jury back pay award goes overboard by failing to appropriately offset Climent's overtime pay. Again, this claim flounders for lack of evidence in the trial record. The MTA attached to their Rule 59(e) motion a biweekly breakdown of Climent's pay rate from August 2007 until August 2008, indicating that after overtime, Climent consistently made much more than $2,810 each month. Even presuming that these numbers are correct, however, they were not introduced at trial. In fact, having reviewed the entire trial transcript, the references to overtime pay are strikingly limited.

First, while cross-examining Climent, the MTA asked a series of questions attempting to elicit an admission that, between August 2007 and August 2008, she often made as much as $6,000 per month in her permanent position. Climent answered that she thought the quoted numbers were too high, although presumably she might have received extra money during particular months for covering the responsibilities of a vacationing supervisor. In any case, five years having passed, she felt unable to testify confidently on the issue without reference to a pay stub. Questioning then moved on to other subjects. Second, the MTA called as a witness Jorge Delgado-Arroyo, the MTA's Acting Director for Finance and Administration. He testified as follows:

> Q: . . . [I]n August 2007, did [Climent] earn
> less or more than the $3,610 that she was
> earning?
> A: She earned more.
> Q: Now, can you tell us: during the next year,
> if she earned monthly more, the same or less
> than she was earning as interim manager?
> A: She earned more.

Therefore, evidence in the record -- if fully credited by the jury -- proves at most that Climent earned, on average, more than $3,610 each month between August 2007 and August 2008. The MTA offered no evidence that she continued to work overtime beyond August 2008, leaving nearly four years of the eventual damages period uncontested. Moreover, it introduced no extrinsic evidence in the form of pay stubs or records to support its calculations, and it never introduced testimony establishing Climent's precise earnings for each month during this period. Although the MTA's evidence did suggest that, for at least two months, Climent made more than $4,342, it failed to otherwise show how Climent's pay rate compared with that of the Maritime Transportation Administrator position.

This scant evidence cannot carry the day. Based on the imprecise and incomplete nature of the evidence presented at trial, we cannot say that no rational jury could have calculated Climent's damages without offsetting overtime. Cf. Koster v. Trans World Airlines, Inc., 181 F.3d 24, 34 (1st Cir. 1999) ("[T]estimony . . . as to back pay and future pay was quite specific. . . . In the face of such firm evidence of economic damage, we cannot say that the jury could reasonably conclude Koster was damaged above

-14-

and beyond what he said his damages were."). Moreover, even had the jury accounted for overtime during this year-long period, evidence in the record also indicated that Mulero received a merit-based raise of approximately $500 after fourteen months as Maritime Transportation Administrator. Therefore, a rational jury could have concluded that one year of overtime was equal to or offset by nearly four years at this heightened pay rate. Consequently, we find the district court did not abuse its discretion in denying remittitur on this basis.

## III. Conclusion

In considering this appeal, we view the evidence in the light most favorable to the verdict. From that vantage point, we cannot say that the jury's damages award was irrational or unmoored from the record. Accordingly, we affirm.

**Affirmed.**