IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2018 Session

## MELINDA KEELING v. COFFEE COUNTY, TENNESSEE ET AL.

**Appeal from the Circuit Court for Coffee County**
**No. 40613     J. Curtis Smith, Judge**

_____

### No. M2017-01809-COA-R3-CV

_____

After a jury awarded a terminated employee compensatory damages for a county's violation of the Public Employee Political Freedom Act ("PEPFA"), the trial court awarded equitable damages. On appeal, the county argues that the trial court erred in excluding the findings of a neutral committee appointed by the mayor. We find no abuse of discretion in the trial court's decision to exclude the findings as hearsay. As to the county's assertion that the trial court erred in awarding damages related to the employee's termination because the verdict form did not ask the jury to make a finding that her termination resulted from the PEPFA violation, we conclude that the county waived this issue by failing to raise it before the jury returned its verdict. We reject the county's challenges to the amount of back pay awarded to the employee. Furthermore, we find that the trial court did not err in awarding front pay, or in declining to include benefits in the front pay award. The employee asserts that the trial court erred in concluding that she failed to mitigate her damages, and we agree that the county failed to meet its burden of proof on the issue of mitigation of damages. On the sole issue of mitigation of damages, we reverse the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

W. Carl Spining, Nashville, Tennessee, for the appellants, Coffee County, Tennessee and Glenn Darden.

Jerry Gonzalez, Murfreesboro, Tennessee, for the appellee, Melinda Keeling.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

Melinda Keeling worked in the Coffee County Codes and Safety Department ("the Department") as a permits clerk beginning in 2006. Prior to her employment at the Department, Ms. Keeling worked for Coffee County in the office of the Clerk and Master. In 2007, Glenn Darden was hired as a codes inspector; in 2009, the head of the Department resigned, and the county mayor promoted Mr. Darden to the head position.

In September 2013, Ms. Keeling filed this PEPFA lawsuit alleging causes of action against Coffee County pursuant to Tenn. Code Ann. § 8-50-603,[1] and against Mr. Darden for assault. According to Ms. Keeling's complaint, even before Mr. Darden was promoted to department head, he "would never be available for members of the public to ask questions about building permits and other issues relevant to that office." Although she complained to the department head, "nothing was ever done." Then, once Mr. Darden became Ms. Keeling's supervisor, his lack of availability continued, and he started making changes to personnel policies.

On November 12, 2009, Ms. Keeling talked to the mayor about the complaints she was hearing from the public concerning Mr. Darden's lack of availability. She subsequently wrote several letters to the mayor. According to Ms. Keeling, when Mr. Darden heard about her communication with the mayor, he retaliated against her—for example, by taking away duties that provided her with compensatory time off, moving things around in the office, giving her the cold shoulder, and putting a negative letter in her personnel folder. Ultimately, in May 2010, Mr. Darden eliminated Ms. Keeling's position, ostensibly due to lack of funds and/or lack of work.

### The trial

This case went to trial before a jury over the course of two days in January 2017. Ms. Keeling was the first and only witness who testified on her behalf. She testified that she worked as a deputy clerk for the Chancery Court of Coffee County for three-and-a-half years and then had the opportunity to transfer to the Codes Department, where she worked for another three-and-a-half years. She was hired by the Codes Department as an administrative assistant. Her job responsibilities included attending meetings of the planning commission and board of zoning appeals, taking the minutes of the meetings, notifying commissioners by letter of the meetings, interacting with customers coming in

---

[1] The Public Employee Political Freedom Act makes it unlawful for a public employer "to discipline, threaten to discipline or otherwise discriminate against an employee because such employee exercised that employee's right to communicate with an elected public official." Tenn. Code Ann. § 8-50-603(a).

to obtain groundwater protection or septic tank permits from the State (an adjoining office), assisting customers with filling out applications for building permits, data entry, accepting and receipting money, and handling walk-ins and persons looking for Mr. Darden.

Ms. Keeling testified that David Pennington was the county mayor when she worked for the County. When she was hired by the Codes Department, Ronnie Branch was the head of the Department. Part of Ms. Keeling's job was to prepare the agenda and take the minutes for the planning commission and board of zoning appeals meetings and to attend the meetings, which occurred in the evenings. She received compensatory time off ("comp time") for these extra hours of work. At some point, Ms. Keeling's title changed from administrative assistant to permits clerk. She continued to have the same duties and the same salary. Ms. Keeling stated that, with the state and county duties combined, she stayed busy in her job.

According to Ms. Keeling, customers had difficulty reaching Mr. Darden. She stated: "When the customers had questions, I couldn't track him down or get him to meet with the customers to answer their questions." She was not qualified to answer the questions they had. After Mr. Branch left, the way the office was run did not change at first. People complained about not being able to find Mr. Darden. Sometimes they would be angry. Despite Ms. Keeling leaving messages for Mr. Darden, customers would report that they still did not hear from him. In the time period from around September through November 2009, Ms. Keeling estimated that Mr. Darden was out of the office 75 to 80% of the time. She could reach him on his cell phone, but customers were not given his cell number. Meanwhile, Ms. Keeling was busy at the office.

Ms. Keeling acknowledged that Mr. Darden had talked to her before November 2009 about turning in incomplete applications. She explained that the process was for customers to hand an application to her and she would then turn it over to Mr. Darden. She would assist the customer in filling out the application, but there was a section that the customer could not fill in "which had to do with dimensions of the building and calculation of the fees based on those dimensions." Ms. Keeling testified that only Mr. Darden could fill out that section, and that was the only section of the application that she would leave blank because she "was not entitled or qualified" to complete it. Mr. Darden would complain to Ms. Keeling that such applications were incomplete, and she would explain her dilemma—i.e., that, under his policies, she was not trained or certified to answer those questions. Mr. Darden never resolved this dilemma for Ms. Keeling. Customers would ask her questions about the fees on a daily basis, and she did not know how to answer them.

When Ms. Keeling told Mr. Darden that people had come by to see him with questions and he had not been there, he would say, "They'll have to catch me when I'm

in the office," or, "They'll just have to wait until I'm available." Ms. Keeling suggested that he set office hours, but Mr. Darden refused to do so.

Ms. Keeling gave the following description of an incident that occurred on November 12, 2009:

A. Well, I was in the office alone that day. And a lady came in with her sick child. And said she had tried to get ahold of Mr. Darden three different times, in person, in the office and could not catch him in the office. And while I was standing there getting ready to hand her an application, another customer came in, same complaint. They had tried three or four times to get ahold of Mr. Darden and couldn't catch him in the office. And then, another—two more men came in trying to get ahold of Mr. Darden, same complaint. But this guy had driven from like, Murfreesboro, I believe. All three of them came in trying to reach Mr. Darden, which they had done on previous occasions, many times.
Q. So what did you tell them? Or, what did you do after that?
A. At that point, I didn't know what else to do, due to the fact that they had tried several times. A couple of them had called Mr. Darden. And he said, I don't make in-office appointments. At least, two-out-of-three of them said that. So I took them to the Mayor's assistant, and told her what was going on. By "took them," I mean I escorted them down the hallway into the Mayor's office and spoke with his assistant and told her that this situation had occurred. That they had tried to get ahold of Mr. Darden via phone and in person, and they could not get in touch with him to get their questions answered. She, in turn, she, being his assistant, told me to take it into the Mayor's office and explain it to him, which I did.
Q. What did you tell the Mayor?
A. I told him that these people had tried on many different occasions to get ahold of Mr. Darden to get building questions answered or septic, any kind of questions they had regarding building a structure on their property or getting a permit for somebody else. One guy was trying to get a house for his mother, so he could take care of her. Couldn't get any of the questions answered by Mr. Darden. And I explained that to Mayor Pennington. That they had tried calling and coming in the office, all to no avail.
Q. Did you tell the Mayor about your perceptions of Mr. Darden's conduct?
. . . .
A. Other than being unavailable all the time, he had somewhat of a negative attitude. You know, saying that they can just wait or they can find him when he's available. Or, you know, the, I'll get to you when I can, attitude.

Q. Were these members of the public, were they present when you were talking to the Mayor?

A. Yes, they were.

Q. Then, what happened?

A. Then, I went back to my office, and a couple of the people, the customers, stayed in the office with the Mayor. And I went back to my office. And a few minutes later, I went to lunch.

Q. Now, any of these people you took to the Mayor's office, or any of the four that approached you in your office, had they tried to fill out an application of any sort?

A. They had done the name, address, phone number, location of the site, that they were wanting to either build or add additional space to. They had given me all of the information I needed, except they didn't want to pay the building permit fee, which I think was $250, I think. And it got to the part that only Mr. Darden could do. So I left it on my desk and went to lunch. I left the applications.

. . . .

Q. And then what happened—well, as you were leaving the Mayor's office, did you hear the Mayor say anything with regards to wanting to see Mr. Darden?

A. He told his secretary, Roxane Patton, to get Glenn in here.

. . . .

Q. What happened when you returned from lunch?

A. Mr. Darden was, actually, in his office. I could hear him over there. And he came and jerked the door open and told [me] to come in his office and sit down.

Q. And what did you do?

A. I did, exactly, what he told me. His eyes were bloodshot. His face was, extremely, red and he had a very, very angry look on [his] face, and I was scared.

. . . .

Q. Then, what happened?

A. Then, he came across the desk. He had a pencil in his hand, and he shook it in my face, and said, "If you ever take anyone else to the Mayor's office, I'm going to write you up." And he said, "If you ever turn in another application that's not complete, I'm going to write you up."

Q. Did you know what application he was referring to?

A. The building permit application.

Q. The same one that was left on your desk?

A. Yes.

Q. The same one as the individual that had gone to the Mayor and complained about Mr. Darden?

A. That's correct.

- 5 -

Q. That's the building application he was complaining about being incomplete?
A. That's correct?
Q. Did you turn it into Mr. Darden?
A. No, I did not. It was on my desk when I left for lunch.
Q. Did you say anything in response to that?
A. No.
Q. Why not?
A. There wasn't . . . there wasn't –
Q. Did you say anything in response, either, to him shaking the pencil in your face, saying that he was going to write you up or anything about the incomplete application? What did you say in response to all of that?
A. I was scared to death. I said nothing.
Q. What were you thinking at the time? You say you were scared to death. What were you thinking at the time? What did you think he would do?
A. I was afraid he was going to hit me. It was so violent, the look on his face and his actions.
Q. Did you understand what he was so angry about?
A. No. Except, that I had complained to the Mayor. I had taken those people to the Mayor. That's the wrath of all of his anger, or the beginning, start of all of his anger.
Q. Had you ever seen him angry like that before?
A. No.

Ms. Keeling testified that, after the meeting, she began to feel "a little sick" and developed a headache. Mr. Darden allowed her to go home.

Ms. Keeling wrote Mayor Pennington a letter dated November 16, 2009, in which she lodged a formal complaint against Mr. Darden. She stated that she "felt improperly threatened with disciplinary action and harassed by Mr. Darden's unprofessional words and actions" in violation of her rights as set forth in the County's personnel manual. After outlining her complaints about Mr. Darden's absences from the office, Ms. Keeling described his behavior toward her when she returned to the office after lunch on November 12, 2009. She wrote: "Mr. Darden then violently shook a pencil at me, very close to my face . . . and very loudly threatened 'If you ever take someone to the mayor's office to complain, I'll write you up.'" Ms. Keeling hand-delivered the letter to the mayor.

After the mayor received Ms. Keeling's November 16 letter, he showed it to Mr. Darden. (The mayor informed Ms. Keeling that he allowed Mr. Darden to read her letter.) Mr. Darden then called Ms. Keeling into his office on November 18, 2009, and showed her a letter of reprimand he had written dated November 16, 2009. In his letter, which Ms. Keeling read into the record, Mr. Darden expressed "concern that you are not

following my instructions, as to seeing that applications for building permits are completed in their entirety." The letter also states that "[p]resent job responsibilities will change and will also be increased from time to time." The letter of reprimand was "being placed in [Ms. Keeling's] personnel file for a period of one year (1) provided no further disciplinary actions are taken." Ms. Keeling testified that she had never before received a letter of reprimand in the Department. She again explained to Mr. Darden why she was not able to complete part of the building permit applications. She did not recall what, if anything, he said in response.

Ms. Keeling responded to Mr. Darden's letter of reprimand by writing another letter to the mayor dated November 19, 2009, stating that she considered the letter of reprimand to be continued harassment and retaliation. Mayor Pennington sent Ms. Keeling a letter on December 1, 2009, informing her that, although he believed Mr. Darden's actions were well-intentioned, he was "concerned about the sequence of events and fear[ed] that the reprimand could be interpreted, due to the time factors, as a reaction to your directly contacting my office on County matters . . . ." The mayor was, therefore, instructing the human resources administrator to remove the letter of reprimand from Ms. Keeling's personnel file. He was also suggesting that Mr. Darden establish "a written policy concerning office operations" to avoid future misunderstandings.

Ms. Keeling testified that, after the mayor's letter, Mr. Darden established policies and procedures for the Department. These policies provided that the codes director would approve the relocation of office furniture or wall hangings, which included the codes map. Ms. Keeling testified that she used the codes map on a daily basis. The previous codes director had the map framed and placed in her office. Ms. Keeling came into her office one day and found that Mr. Darden had moved the map into his office. Mr. Darden now kept the door to his office closed, so every time Ms. Keeling needed to consult the map she would have to interrupt Mr. Darden and go across his large office to consult the map. Ms. Keeling asked him if the map could be moved back to her office because she needed to consult it frequently, but he refused. The location of the map was not an issue prior to Ms. Keeling complaining to the mayor.

Another change under Mr. Darden's new policies concerned the thermostat control settings. Only the codes director could change the thermostat under the new policy. At that time, the Department only had two employees, Mr. Darden and Ms. Keeling, and Mr. Darden was out of the office the majority of the time. Ms. Keeling testified that, after this policy was implemented, she was sometimes too hot or too cold with the temperature set by Mr. Darden but did not feel comfortable complaining to him about it. He never asked her whether the temperature was suitable for her.

Ms. Keeling wrote a letter to the mayor dated December 3, 2009, in response to the mayor's letter of December 1, 2009. She stated that the "workplace environment has deteriorated further," and that she "consider[ed] the changes in [Mr. Darden's] lack of

verbal communications to be passive-aggressive 'cold-shoulder treatment,' and a continuation of his harassment and retaliation." Ms. Keeling also cited changes in her job description and office policies, which she considered "possible retaliation." Ms. Keeling testified that she was no longer informed of what was going on in the Department.

Ms. Keeling testified that she overheard Mr. Darden talking to people in his office at times. She heard him say, "I've got a stupid employee," and "I've been trying to get her a** fired for a long time now." She also heard him say, "It's just taking me a long time." Ms. Keeling took notes when she heard Mr. Darden say these things. She heard Mr. Darden having a discussion with the person in charge of the state groundwater protection office, who suggested that Mr. Darden "do it like I do," which meant to have an answering machine and have calls roll over to the mayor's office.

In a letter to the human resources department coordinator dated December 17, 2009, Mr. Darden stated: "I have determined there is no longer a need for the position of a Permit's Clerk." According to him, he could perform the work of the permits clerk by using the answering device on the phone system or "possibly let the calls roll over to the Mayor's office where I can pick up any messages which are received for me during the day." He requested that the "layoff" for this position begin effective January 6, 2010, with the permits clerk being paid for two weeks but not allowed to remain in the office. Mr. Darden requested that the County begin advertising for the new position of enforcement officer for the property maintenance area. Ms. Keeling was not aware of this letter at the time.[2]

Also in December 2009, Mr. Darden informed Ms. Keeling that her services were no longer needed at board meetings and that he would take the minutes. Under the new policies, Mr. Darden had to approve all comp time in advance in writing. He denied Ms. Keeling's requests for comp time for the board meetings, which had previously been part of her regular job duties.

On May 27, 2010, Mr. Darden wrote a letter of termination to Ms. Keeling which stated: "Due to budget constraints and a lack of sufficient building permits to fund a permits clerk, effective this date, you are laid off." The human resources officer gave the letter to Ms. Keeling. The County budget for the time period in question showed that the Department was funded for three positions.

Ms. Keeling testified that she felt that all the changes in behavior and anger that Mr. Darden exhibited toward her resulted from her going to the mayor and complaining about his conduct.

---

[2] No "layoff" occurred in December 2009 or January 2010.

On cross-examination, Ms. Keeling acknowledged that Mr. Darden had asked her to investigate two property maintenance complaints for codes enforcement and presented her with related follow-up letters to sign. Ms. Keeling testified that she felt unsafe in the Department vehicle "because it had bad tires" and that she told Mr. Darden she did not feel safe doing the inspections. On redirect, Ms. Keeling recalled Mr. Darden saying that he was cautious when going out on inspections because someone might pull a gun on him, or saying that he was in fear. She stated that Mr. Darden had written the letters, and she did not understand why he did not sign them himself, but she was afraid to ask him for fear he would blow up at her.

The County's first witness was Glenn Darden, who testified that he began working for the Department in the fall of 2007 as a building inspector. He had passed the exam to become a commercial building inspector when he was hired, and he received his residential building certification in April 2008. No one else in the office was certified as a building inspector. Mr. Darden explained that, after a building permit was issued, the Department conducted three inspections, which required him to go out to job sites. Mr. Darden testified that he also fielded complaints about property maintenance issues.

Mr. Darden became director of the Department after the previous director, Ronnie Branch, left. He went over the building permit application form with Ms. Keeling and explained the importance of filling in all of the requested information. Mr. Darden testified that, when he became codes director, he thought about making changes in the office. Because the office did not issue many permits, he thought that Ms. Keeling could help with the property maintenance process by sending out an initial letter, taking photographs, and handling complaints. He talked with Ms. Keeling and showed her a form letter, but she said that she was not comfortable signing it. He asked her to go out and take some photographs at a location where one person's chickens were going into another person's yard. Ms. Keeling called back and said she could not find the place. Mr. Darden gave her some directions, but Ms. Keeling returned saying that the camera's batteries were dead. When Mr. Darden talked with Ms. Keeling and asked her to sign the letter, she said she was not comfortable doing so.

Asked about the November 16, 2009 letter of reprimand, Mr. Darden stated that the application in question was not complete. He stated that the application was one concerning Beech Grove about which Ms. Keeling had taken applicants to the mayor's office on November 12, 2009. He recalled that, on November 12, the mayor's assistant called him. Mr. Darden went straight to the Department, looked on Ms. Keeling's desk, and found the application regarding the Beech Grove property. The application was not complete; it contained only the location of the property and did not provide enough information for him to contact anyone. Sometime that day, Mr. Darden testified, he called Ms. Keeling into his office to discuss the application. Mr. Darden did not agree with Ms. Keeling's account of their meeting. Although he stated that he had a pen or pencil in his hand, he denied gesturing in a threatening way or being angry. Mr. Darden

acknowledged telling Ms. Keeling that, "if she ever failed to get one of those applications complete, that I'd write her up." Mr. Darden denied any intent to create fear in her. Ms. Keeling left the meeting and went back to the mayor's office.

Mr. Darden could not recall "for certain" whether the mayor showed him the letter of complaint that Ms. Keeling wrote to the mayor on November 16. He testified that the mayor came to his office and asked him if he shook a pencil at Ms. Keeling, and that he denied doing so. With regard to the letter of reprimand dated November 16 that he wrote to Ms. Keeling, Mr. Darden acknowledged that this letter referenced the incident of November 12 and the incomplete Beech Grove application. He denied giving Ms. Keeling the reprimand in retaliation for her going to the mayor's office. He testified:

> The only reason I would have given [the letter of reprimand] to her was because I considered the fact whenever I gave her the verbal reprimand, she never did acknowledge that she would see that those applications were completed and jumped up and left the desk and went to [the mayor's] office. That's the reason I decided to go with a written reprimand.

Mr. Darden testified that he established office policies and procedures in December 2009 after being asked to do so by the mayor. He stated that he did not direct the policies at any one person. Mr. Darden denied telling anyone that he was trying to get rid of Ms. Keeling and calling her "a stupid employee." He denied telling Charles Harris, "I'm trying to get her fired." Mr. Darden acknowledged sending a memo to Heather Skelton, in human resources, in December 2009, asking that the permits clerk position be laid off but denied that he was acting in retaliation for Ms. Keeling's actions. According to Mr. Darden, he was attempting to restructure the office because he needed someone in the office to help with building inspections and property maintenance issues.

As Mr. Darden testified, Ms. Keeling's position was not eliminated in December 2009. She continued to work in the Department. He stated that she did not assume any of the property maintenance responsibilities and that the permit applications traffic stayed relatively light. On May 27, 2010, Mr. Darden wrote a letter to Ms. Keeling informing her that her position was being eliminated. When asked why he made this decision, Mr. Darden gave the following testimony:

> Because I needed to move forward with getting someone in that would do the work that I needed to be done in the property maintenance area and a building inspector, as well. The budgets wouldn't—as I saw it, allow me to add another person and have three people in the office. If we could do it with two, two people, who could do property maintenance, building inspections, could meet people at the door.

When he became director of the Department in October 2009, Mr. Darden explained, the budget allowed for three positions. In the budget Mr. Darden proposed for the 2010 fiscal year, he did not include a permits clerk. He did not, thereafter, hire anyone for that position. He hired someone as a property maintenance officer who would work toward receiving certification as an inspector.

On cross-examination, Mr. Darden disputed Ms. Keeling's estimate that he was out of the office 75 to 80% of the time. With an average of one to one-and-a-half permits a week, Mr. Darden thought he would not have been gone 30 to 40% of the time. He acknowledged that, when he admonished Ms. Keeling about the incomplete Beech Grove application on November 12, 2009, this was the first time he had admonished her about incomplete applications.[3] Then, because he did not like the way she responded to his verbal reprimand, he decided to make a written reprimand.

Although, at the hearing, Mr. Darden denied being angry when he met with Ms. Keeling on November 12, 2009, during his deposition in 2012, he stated that he was angry at her during that meeting. Asked why he was angry at this meeting, Mr. Darden testified: "Because there were countless applications where they were never completed. . . . And that one pretty much took the cake."

David Pennington, former county mayor, testified for the County and described what happened when Ms. Keeling brought two men to his office on November 12, 2009, concerning a building permit and the mayor then called Mr. Darden. He further detailed his interactions with Ms. Keeling, who returned to his office to make another complaint on November 16, and his decision to remove Mr. Darden's letter of reprimand from her personnel file. Mayor Pennington was aware of Mr. Darden's desire, as expressed in his December 2009 letter, to eliminate Ms. Keeling's position, but he advised Mr. Darden against laying her off at that time. Mayor Pennington testified that he was consulted before Mr. Darden laid Ms. Keeling off in May 2010.

The jury returned a verdict finding that Ms. Keeling had proven all of the elements of her PEPFA claim and that she had suffered damages for pain and suffering, humiliation and/or embarrassment in the amount of $10,000. The jury found that she had failed to prove her assault claim. On January 26, 2017, the trial court entered a partial judgment in the amount of $30,000, trebling the damages in accordance with PEPFA.

---

[3] Soon thereafter, Mr. Darden changed his answer and said that there had been other instances of incomplete applications that he had discussed with Ms. Keeling, but this was the first time that he had "admonished" her.

On January 25, 2017, Ms. Keeling filed a motion for equitable damages—including back pay, front pay, loss of benefits, and pre-judgment interest. According to her motion, the parties agreed that "equitable damages were to be determined by this Court after a jury trial on liability and emotional damages only." Coffee County opposed Ms. Keeling's motion, arguing that the court should refuse to award the requested damages. Part of the basis of the County's argument was that the court did not allow it to put on evidence showing that Ms. Keeling's termination was not the result of her speaking to the mayor. According to the County's argument, the jury's findings of a violation of PEPFA and damages flowing from the violation did not necessarily mean that Ms. Keeling's termination was part of the resulting damages. The County also asserted that, even if the court found it proper to award equitable damages, the amount should be reduced to take into consideration Ms. Keeling's duty to mitigate and the trebling of damages required by the statute.

In an order entered on March 13, 2017, the trial court ruled on Ms. Keeling's motion for equitable damages. On the evidentiary issue raised by the County, the trial court made the following ruling:

> At trial, Defendants sought to introduce a letter from County Commissioner Sam Rittenbury, Personnel Policy and Salary Review Committee Chairman, dated December 30, 2009. The purpose of the letter was to show Coffee County's attempts to address Plaintiff's concerns that she was suffering discrimination. The Court ruled the letter was hearsay and denied entry of the letter into evidence. Both trial counsel agreed to jury instructions that a cause of action under the Public Employee Political Freedom Act ("PEPFA") is complete once a Plaintiff communicates to an elected official about a work-related matter and that communication was a substantial or motivating factor in the commission of a discriminatory act. The Court finds in addition to being hearsay the letter was irrelevant to any issue presented to the jury or on any issue to be considered by the Court on equitable damages. The Court finds denial of the introduction of this evidence, at trial, or other trial rulings, are not a bar to the consideration of equitable damages.

The court ruled that the issue of mitigation of damages would have to be determined at the hearing on equitable damages, rejected the County's argument that unemployment compensation should be deducted from any recovery, and rejected the County's argument that there should be an offset to front pay in consideration of treble damages.

The County filed a motion for a new trial on February 24, 2017, on the basis that the trial court erred in excluding evidence of the County's formation of a committee to

investigate Ms. Keeling's allegations and the subsequent findings and actions of the committee. The County further asserted that the verdict was against the weight of the evidence. The County filed a supplement to its motion for a new trial in April 2017 to assert that the jury verdict was confusing "because it does not state whether the elimination of Ms. Keeling's position was itself a violation of the Tennessee Public Employee Political Freedom Act (PEPFA)."

The court held a hearing on equitable damages on March 21, 2017. In an order entered on May 1, 2017, the court rejected the County's argument that Ms. Keeling was not eligible for damages for the years during which no permits clerk was included in the budget. The court reasoned as follows:

> The trial jury found that Defendant Glenn Darden unlawfully discriminated against Plaintiff as the department head and he developed the code department's budget which eliminated Plaintiff's position. Her last date of employment was May 27, 2010. Upon Mr. Darden's retirement in September, 2015, the Coffee County Mayor immediately sought and obtained an amendment to the Coffee County budget for the codes enforcement office which re-established essentially the position which Plaintiff had held. The Court finds that failing to fund the position which Plaintiff occupied in the codes enforcement office was a continued act of discrimination by the Defendants rendering consideration of equitable damages appropriate for the period during which no permits clerk or comparable position was budgeted.

On the issue of mitigation of damages, the court found that the "Defendants have carried their burden of proof that Plaintiff's employment at the Allstate Agency was substantially equivalent employment to her employment in the Coffee County codes enforcement office."[4] The court also determined that Ms. Keeling was entitled to back pay from the date she was terminated until January 12, 2017, and to front pay for a period of four years from the date of judgment. Both front pay and back pay were to be trebled as required by PEPFA. With these guidelines, the parties were encouraged to agree on a judgment amount.

After both parties responded to the court's order, the trial court entered another order on June 9, 2017, clarifying its ruling on equitable damages. On July 7, 2017, the trial court entered judgment with the following equitable damages: back pay in the amount of $90,512.18; back benefits in the amount of $35,890.84; prejudgment interest in the amount of $11,968.39; and front pay in the amount of $16,008.00, for a total of

---

[4] Ms. Keeling worked for an Allstate agency from August 24, 2015 through September 14, 2015, when she left the job voluntarily.

$154,379.41 in equitable damages, translating to $463,138.24 in treble damages. Court costs and attorney fees were yet to be determined.

On August 8, 2017, the County filed a second supplement to its motion for a new trial asserting that Ms. Keeling should not be awarded equitable damages for the time period when there was no permits clerk position in the County budget. The trial court heard the County's motion for a new trial, as well as other pending motions, on August 15, 2017. The court denied the motion for a new trial but granted the County's motion to stay execution of the judgment pending appeal.

Issues on appeal

On appeal, the County asserts that the trial court erred: (1) by excluding the findings of a neutral committee appointed by the mayor to review employment concerns, (2) by awarding termination-related damages when the jury did not find that the termination resulted from a PEPFA violation, and (3) by awarding back pay when Ms. Keeling's position was not filled following her termination and without offsetting the award with her unemployment benefits. Ms. Keeling raises two issues of her own, namely, whether the evidence preponderates against the trial court's determination regarding mitigation of damages; and whether the trial court abused its discretion in ruling that front pay damages would not include the value of benefits.

ANALYSIS

I. Employment review committee findings.

The County argues that the trial court made a "crucial mistake" during the second day of trial that "unfairly altered the verdict." The mayor appointed a committee to address employment concerns regarding Ms. Keeling, and the defense wanted to introduce into evidence a letter detailing the findings of the committee. The letter was signed by Sam Rittenberry, a member of the committee, and has been called "the Rittenberry letter."[5] After the trial court ruled that the letter would be excluded, the defendants made an offer of proof.

---

[5] The Rittenberry letter, dated December 30, 2009, was written to Ms. Keeling and states that the committee met with her and her attorney on December 17, 2009. The committee recommended that Mr. Darden's letter of reprimand be removed from her personnel file. Although it did not feel that Mr. Darden had harassed Ms. Keeling, the committee stated that there was a "communication problem" and suggested that Mr. Darden establish written guidelines to clarify his expectations. The committee also opined that Ms. Keeling's behavior of carrying a tape recorder to document office conversations only served to heighten tensions. The letter generally cautioned Ms. Keeling that she needed to accept Mr. Darden's policies and that the committee did not think any action to remove him was warranted.

The admissibility of evidence is within the trial court's sound discretion, and we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). Under an abuse of discretion standard, this court cannot substitute its judgment for that of the trial court. *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008). An abuse of discretion will be found only if the trial court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." *Id.*

From the excerpt of the trial court's May 13, 2017 order set out above, we note that the trial court excluded the evidence at issue on the ground of hearsay. The County failed to include in the record most of the trial court's ruling on the exclusion of this evidence. The trial court's decision was within its discretion, and the County has not established that the court failed to consider the applicable legal principles or that it erroneously applied the applicable legal principles. *See Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524-25) (stating that a reviewing court must determine "whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision"). Accordingly, we are unable to conclude that the trial court abused its discretion in excluding the findings of the neutral committee set forth in the Rittenberry letter.

II. Damages related to termination.

The County argues that the trial court erred in awarding Ms. Keeling damages related to her termination from employment because the jury did not make a finding that her termination resulted from a PEPFA violation. Before the jury began to deliberate, the court provided the jury with a verdict form on the PEPFA claim that included only the following two questions:

1. Has the Plaintiff proven by a preponderance of the evidence all of the elements of the claim for Public Employee Political Freedom Act?
    Yes _____          No _____

If your answer is "No," go to the end, sign and return the jury verdict form to the Court. If your answer is "Yes," go to the next question.

2. Decide the amount of any damages sustained by Ms. Keeling for pain and suffering, humiliation and/or embarrassment.
    $ _____

After answering the first question in the affirmative, the jury decided that Ms. Keeling was entitled to $10,000 in damages for pain, suffering, humiliation, and embarrassment. At the equitable damages phase, conducted by the court sitting without a jury, the court awarded Ms. Keeling damages flowing from her termination.

On appeal, the County states that the court erred in so doing because the jury did not make a finding that Ms. Keeling lost her job as a result of a PEPFA violation. The County maintains that it does not object to the jury verdict form or jury instructions. It summarizes its position as follows:

> If Keeling wants damages relating to a loss of employment that occurred months after the alleged PEPFA violation took place; Keeling must (1) ensure that the jury is instructed as to proximate cause, and (2) that the jury verdict form includes a finding that Keeling lost her job as a result of the alleged PEPFA violation.

Thus, despite the County's protestations to the contrary, its argument does, in fact, challenge the trial court's verdict form and jury instructions.

There is no dispute that, in order to be entitled to damages under PEPFA, a plaintiff must prove that "'the communication with an elected official was a substantial or motivating factor in the discriminatory action taken by the employer.'" *Todd v. Shelby Cnty.*, 407 S.W.3d 212, 228 (Tenn. Ct. App. 2012) (quoting *Gooch v. City of Pulaski*, No. M2006-00451-COA-R3-CV, 2007 WL 969398, at *7 (Tenn. Ct. App. Mar. 30, 2007)). In this case, however, the jury instructions clearly informed the jury of this requirement. The trial court stated, in its instructions to the jury:

> Ms. Keeling has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: (1) that Coffee County violated the Public Employee Political Freedom act and/or, (2) that Mr. Darden assaulted Ms. Keeling. And, (3), the nature and extent of the injuries and losses she claims as a result of these various claims.

Furthermore, the court explained, under PEPFA, the plaintiff must prove that "the communication with an elected public official was a substantial or motivating factor in the adverse action taken by the employer." The trial court went on:

> Plaintiff may establish an inference that her communicating with an elected public official was a substantial or motivating factor in any adverse action taken against her by offering evidence of the temporal proximity or closeness in time between her communicating to an elected official and the adverse action. You may consider the temporal proximity between the

plaintiff's communication with an elected official, and any adverse action taken against her as circumstantial evidence of defendant's motive or intent.

The ultimate decision as to plaintiff's retaliation claims depend[s] on whether plaintiff has shown by a preponderance of the evidence that her communicating with an elected official was a substantial or motivating factor in any adverse action taken against her.

The heart of the County's argument is the verdict form, which does not mention the causation issue. The parties and the court engaged in a bench conference regarding the language of the jury verdict form during a break in the proceedings on January 11, 2017, and both parties made suggestions:

THE COURT: Retaliatory discharge with appropriate changes in the language there, that would seem to be, at least, as it relates to the claim against the County.
MR. GONZALEZ [Counsel for Ms. Keeling]: I had drafted a sample and it's very similar to this but we had a little bit of dispute about that.
MR. SPINING [Counsel for the County]: Well, [yours] was, Do you find in favor [of] one or the other?
MR. GONALEZ: Right.
MR. SPINING: Mine was more like that.
MR. GONZALEZ: Well, yours—
THE COURT: Well, if it's a yes and a no, and if it's, no, you go no further. And if it's, yes, you go down through the progression.
MR. SPINING: Well, Judge, I wanted in the Jury verdict form, "Has the plaintiff proven by preponderance of the evidence that an adverse employment action was taken as a substantial or motivating factor?" And just track that language.
MR. GONZALEZ: See, he wanted you to track the jury charge language.
THE COURT: Yes, well, I think that this one with changes with language, substituting, you know, public employee, political freedom act, instead of retaliatory discharge. Seems like that would cover that.
MR. GONZALEZ: I agree. I agree.
MR. SPINING: I mean, I know the Jury charge had the substantial or motivating cause.
THE COURT: Oh, it does have it in there. I don't normally put that in. You can, certainly, argue that.
MR. GONZALEZ: There's no need to repeat it in the Jury form.
THE COURT: I don't—as a practice, I don't really remember repeating any law in a charge. I think I'll just use that verdict form for that purpose. I'm sure there's something rather standard for an assault charge. Are you going to be asking for medical or –

- 17 -

MR. GONZALEZ: No. Just straight compensatory suffering, humiliation, embarrassment.

THE COURT: Future?

MR. SPINING: No future.

MR. GONZALEZ: We're going to do that if there's a bench trial later, if we establish liability, if we get a verdict in favor of the plaintiff. We'll come back later before the Court, for the Court to decide any front pay or anything like that.

THE COURT: Hold on just a minute then.

MR. GONZALEZ: So, it's a PEPFA claim, yes or no. And the next one, if, yes, what's your damages?

THE COURT: Well, here it says, that Plaintiff is to be awarded damages, state the amount. Back paying benefits. Again, just take a look at it.

MR. GONZALEZ: But we reserved issues of back pay and benefits to be decided by the Court after the liability phase. We discussed that at the pretrial conferences.

THE COURT: All right.

MR. GONZALEZ: Right. So it would be straight compensatory damages. And he wanted to (inaudible) like humiliation, embarrassment, and so forth, and so on.

THE COURT: So do you just want, Do you find or do you not find? Yes or no?

MR. GONZALEZ: If yes, order damages. Compensatory for emotional suffering, and that's it.

THE COURT: All right.

MR. SPINING: And we've agreed that I may mention that back pay is not at issue or something to that effect.

THE COURT: Is that under the statute that I would determine that? Or you just stipulated?

MR. GONZALEZ: That was an agreement, yes, sir.

THE COURT: Well, that simplifies things.

MR. GONZALEZ: It does.

THE COURT: All right.

MR. SPINING: Well, there's some law that says the front pay issue is to be decided by the Judge, and we just felt it would be more efficient to do it that way.

THE COURT: All right.

MR. GONZALEZ: And that way, he can—his concern was that they may—if they decide for the plaintiff, they may increase it, thinking, well, she really should get front pay but they're not asking for front pay. So, I'm okay with him saying, you're not to worry about any of that.

Immediately after telling the jury about the two jury verdict forms and releasing them to begin deliberating, the judge asked each side if there were "any additional requests or objections." Counsel for the County responded, "None, Your Honor."

Ms. Keeling argues that the County waived any objection to the jury verdict form by failing to object at trial. The County maintains that it is entitled to a new trial at which the jury verdict form includes the issue of whether the County's PEPFA violation caused Ms. Keeling's termination. Thus, we must examine the law applicable to objections to jury verdict forms. We note that, in this case, the court did not use a special verdict form or a general verdict form accompanied by answer to interrogatories; thus Tenn. Rs. Civ. P. 49.01 (Special Verdict) and 49.02 (General Verdict Accompanied by Answer to Interrogatories) do not apply. The principles applicable to the verdict form used in this case have been summarized as follows:

> Counsel should object promptly to a proposed verdict form. If possible, they should object to the form before its submission to the jury. However, if unaware of the form's substance, they should object before the jury returns its verdict. *Savina v. Wisconsin Gas Co.*, 36 Wis.2d 694, 154 N.W.2d 237, 240 (1967). Failure to make a timely objection to a verdict form constitutes a waiver of the objection.

*Keith v. Murfreesboro Livestock Mkt., Inc.*, 780 S.W.2d 751, 759 (Tenn. Ct. App. 1989); *see also Creech v. Addington*, 281 S.W.3d 363, 386 (Tenn. 2009) (citing *Keith* in dicta). In *Keith*, the court concluded that the appellants had "waived their objections to the verdict form used by the jury because of their failure to raise them in a timely manner."[6] *Keith*, 780 S.W.2d at 759.

The County relies upon *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901 (Tenn. 1999), quoting in particular the Court's statement that, "A new trial is also warranted when verdict forms are composed in such a faulty fashion that they do not address each of the plaintiffs' theories of recovery and do not allow the jury to adequately respond to each claim." *Sender*, 2 S.W.3d at 911. The *Sender* case, a lease dispute, is not comparable to the present case. The *Sender* plaintiffs sought damages under several different theories, including common law and statutory claims. *Id.* at 904-05. Unlike in the present case, the court in *Sender* used a special verdict form, but the form did not allow the jury "to convey its findings under each theory of liability presented by the plaintiffs." *Id.* at 905. The jury awarded the plaintiffs $75,000 in compensatory damages and stated that punitive damages were warranted, so the parties agreed to a further hearing on the issue of punitive damages. *Id.* At that hearing, the jury awarded the

---

[6] The *Keith* court noted the appellants' failure to object to the jury verdict form in their motion for a new trial. *Keith*, 780 S.W.2d at 759. The court did not indicate that it would have reached a different result if the appellants had raised the verdict form as an issue in their motion for a new trial.

plaintiffs a large punitive damages award, which the trial court remitted to $500,000 (the amount requested in the complaint). *Id.*

On appeal, the Court of Appeals deemed the verdicts inconsistent because the jury awarded punitive damages but indicated that the award of compensatory damages arose under the Tennessee Consumer Protection Act, which authorizes treble damages. *Id.* at 905-06 (citing Tenn. Code Ann. § 47-18-109(a)(3) & (4) (1995)). After a discussion of the doctrine of election of remedies, the Supreme Court addressed the problems with the special verdict form used by the court. *Id.* 906-09. The Court cited the well-established general principle that "verdicts that are inconsistent and irreconcilable cannot stand." *Id.* at 911. The Court found that "the trial court should have made it clear to the jury that it could not award punitive damages based upon a violation of the Consumer Protection Act," and that, "[w]ithout a clear record of the theories supporting the jury's finding of liability, we cannot determine which form of enhanced damages is warranted in this case." *Id.* at 912. Because of the inadequacy of the verdict form, the Supreme Court remanded the case to the trial court for a new trial. *Id.* There was no mention in the opinion of any objection by either party to the jury verdict form.

Thus, the problem in *Sender* was that the special verdict form did not adequately allow the jury to choose between two remedies—punitive damages or treble damages—that could not be awarded simultaneously. In our case, there was no need to choose between two possible remedies. Unlike in *Sender*, the jury verdict form here was not "inconsistent and irreconcilable." *Id.* at 911.

Another case cited by the County is *Poteet v. National Healthcare of Cleveland, Inc.*, No. E2009-01978-COA-R3-CV, 2011 WL 1484554 (Tenn. Ct. App. Apr. 19, 2011), a medical malpractice case. One of the issues on appeal in *Poteet* was whether the special verdict form prepared by the trial court for the jury was confusing or otherwise improper in that it did not address one of the plaintiff's claims. *Poteet*, 2011 WL 1484554, at *23. In finding that the plaintiffs had not waived the issue by failing to object until after the jury had been discharged, the Court of Appeals cited *Rolen v. Wood Presbyterian Home, Inc.*, 174 S.W.3d 158, 160-61 (Tenn. Ct. App. 2005), for the proposition that the "Tennessee Rules of Civil Procedure provide that an objection to *jury instructions* is not waived where there is a failure to make objection until a motion for new trial."[7] *Poteet*, 2011 WL 1484554, at *23 (emphasis added). Tennessee Rule of Civil Procedure 51.02,[8] cited by the court in *Rolen*, applies to jury instructions, which are

---

[7] After determining that the plaintiffs had appropriately raised their objections to the verdict form in a motion for a new trial, the court in *Poteet* declined to award them a new trial because it found that any error did not affect the outcome of the trial. *Poteet*, 2011 WL 1484554, at *24.

[8] Tennessee Rule of Civil Procedure 51.02 states:

different than a jury verdict form. There are separate rules of civil procedure applicable to special and general jury verdict forms. *See* TENN. RS. CIV. P. 49.01, 49.02. The plain language of Tenn. R. Civ. P. 51.02 does not include jury verdict forms.

The court in *Rolen* was presented with the question of whether the "plaintiffs waive[d] any disagreement with the jury verdict form by failing to timely object." *Rolen*, 174 S.W.3d at 160. Although the defendant argued that the plaintiffs did not object "on the record before the form was submitted to the jury," the plaintiffs responded that, in fact, they did object to the verdict form "before the form was given to the jury" and that their earlier objection was reflected in "the discussion between plaintiffs' counsel and the Trial Court in the transcript of the motion for new trial hearing." *Id.* The *Rolen* court quoted the rule from *Keith v. Murfreesboro Livestock Market*, 780 S.W.2d at 579, that a party should, if possible, object to a proposed jury verdict form before submission to the jury or, if they were "'unaware of the form's substance, they should object before the jury returns its verdict.'" *Id.* The *Rolen* court then added that "plaintiffs raised this issue in their Motion for New Trial, and we have previously found that is sufficient to preserve the issue for an appeal." *Id.* In support of the latter proposition, the court in *Rolen* quoted *Patterson ex rel. Patterson v. Dunn*, No. 02A01-9710-CV-00256, 1999 WL 398083, at \*17-18 (Tenn. Ct. App. June 16, 1999), a case in which the appellate court concluded that the trial court's jury verdict form, even if erroneous, was harmless error, making the *Patterson* court's discussion of the issue and reliance upon Tenn. R. Civ. P. 51.02 dicta. We conclude that the language in *Rolen* concerning a party raising an objection to a jury verdict form in a motion for a new trial was not necessary to the court's decision and should be regarded as dicta. Because the main source of authority for this statement was Tenn. R. Civ. P. 51.02, which applies to jury instructions, not verdict forms, we are not inclined to agree with the *Rolen* court's reasoning on that point.

The court in *Poteet* also cites *Whittemore v. Classen*, 808 S.W.2d 447 (Tenn. Ct. App. 1991), in support of its proposition that objections to a jury verdict form may properly be raised in a motion for new trial. *Poteet*, 2011 WL 1484554, at \*23. This case is not on point, however. *Whittemore* involved a verdict that was incomplete and confusing and required the court to order a new trial. *Whittemore*, 808 S.W.2d at 459. The court could not reduce the jury verdict to judgment because it was "fatally incomplete." *Id.* The problems with the verdict in *Whittemore*, as in *Concrete Spaces*, were inherent in the verdict itself and did not require an objection by a party.

---

After the judge has instructed the jury, the parties shall be given opportunity to object, out of hearing of the jury, to the content of an instruction given or to failure to give a requested instruction, but failure to make objection shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for a new trial.

We conclude that, under the circumstances of this case, the County waived any objection to the jury verdict form used by the trial court. The County assisted the court in drafting the jury verdict form, and the court gave both parties an opportunity to object to the form prior to the beginning of jury deliberations. Counsel for the County specifically declined to object to the jury verdict form. Thus, the County did not make a timely objection to the jury verdict form, and we consider this issue waived.

Based upon the jury verdict, the trial court did not err in awarding Ms. Keeling damages for her termination from employment.[9]

### III. Back Pay/Front Pay.

The County's next argument is that the amount of back pay the trial court awarded was excessive because these damages should have been reduced by Ms. Keeling's unemployment award and for the period of time during which her position was not filled. The County further asserts that the trial court should not have awarded front pay because front pay and back pay together create a windfall for the plaintiff. For the reasons described below, we reject the County's arguments.

*Period when position not filled.* Back pay is an equitable remedy that may be awarded in employment discrimination cases to "'make persons whole for injuries suffered on account of unlawful discrimination.'" *Barnes v. Goodyear Tire & Rubber Co.*, No. W2000-01607-COA-RM-CV, 2001 WL 568033, at *4 (Tenn. Ct. App. 2001) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)). The County asserts that Ms. Keeling should not be awarded back pay for the period from May 2010 to October 2014 because Mr. Darden eliminated the position of permits clerk during that time. As the County points out, there is authority for the proposition that an employee should not recover damages for the time after which a position was eliminated. *See, e.g., Hill v. Spiegel, Inc.*, 708 F.2d 233, 238 (6th Cir. 1983) (holding that cutoff for back pay was when the former employee's entire division was eliminated by previous employer).

The difference in the present case is that the trial court found that Mr. Darden eliminated Ms. Keeling's position as a retaliatory act and that, once Mr. Darden retired, the County reinstituted the position:

> Defendants argue that Plaintiff is not eligible for back pay for those years where no permits clerk was budgeted for the Coffee County codes enforcement office. The trial jury found that Defendant Glenn Darden

---

[9] The County also makes a brief attempt to argue that the trial court erred in failing to consider "all relevant evidence" regarding Ms. Keeling's termination and job performance, namely the Rittenberry letter, an issue upon which we have already ruled. The County had the opportunity to introduce the information in that letter through witnesses but chose not to do so.

unlawfully discriminated against Plaintiff as the department head and he developed the code department's budget which eliminated Plaintiff's position. Her last date of employment was May 27, 2010. Upon Mr. Darden's retirement in September, 2015, the Coffee County Mayor immediately sought and obtained an amendment to the Coffee County budget for the codes enforcement office which re-established essentially the position which Plaintiff had held. The Court finds that failing to fund the position which Plaintiff occupied in the codes enforcement office was a continued act of discrimination by the Defendants rendering consideration of equitable damages appropriate for the period during which no permits clerk or comparable position was budgeted.

The evidence does not preponderate against the trial court's findings, and we reject the County's argument.

*Unemployment benefits.* The County further argues that the trial court erred in failing to reduce Ms. Keeling's back pay award by the unemployment benefits she received. In declining to reduce Ms. Keeling's back pay award by her unemployment compensation, the trial court gave the following rationale:

This Court accepts the minority view set out in *Barnes v. Goodyear Tire & Rubber Co.*, [2001 WL 568033], that whether to deduct unemployment compensation from back pay is discretionary with the Court. *Barnes* noted that normally no offset from back pay should be made for unemployment compensation received by Plaintiff because "[un]employment compensation is paid to further the social policies of the State rather than to discharge an obligation or liability of the employer; consequently, it is deemed a collateral benefit which should not be given consideration in formulating an award of back pay." *Barnes, supra* at *8. This Court finds no deduction for unemployment compensation should be made in any calculation of equitable damages.

The trial court relied upon *Barnes v. Goodyear Tire & Rubber Co.*, 2001 WL 568033, at *8, which adopted the minority view that "the decision of whether to deduct unemployment compensation from back pay is within the discretion of the trial court." The *Barnes* court also cautioned that, "more often than not, such benefits should not be deducted." *Barnes*, 2001 WL 568033, at *8. The court in *Barnes* offered the following explanation:

The purpose of back pay is both to make the victim of discrimination whole and to deter discrimination by the employer. To allow a discriminating employer to offset its liability by deducting unemployment compensation paid by a state agency undermines the deterrence objective of back pay. In

- 23 -

effect, a benefit is conferred upon the employer who committed the illegal discrimination, thus making such discrimination less costly. In choosing between conferring a windfall upon the wrongdoer and the victim of the wrongdoing, the logical choice is the victim. Furthermore, the Court in [*NLRB v. Gullett Gin Co.*, 340 U.S. 361, 364-65 (1951),] expressly stated that declining to deduct unemployment compensation benefits in computing back pay does not make an employee more than whole. In this case, we find no circumstances which would warrant the deduction of unemployment compensation benefits from the back pay award to Barnes.

*Id.* (citations and footnote omitted).

In light of *Barnes* and the trial court's application of its reasoning to this case, we find no abuse of discretion in the trial court's decision not to deduct unemployment compensation from Ms. Keeling's back pay award.

*Front pay.* The County makes a third argument (which is not included in its main issue statement)—that the trial court erred in awarding Ms. Keeling front pay. The main thrust of this argument is that the award of front pay should be eliminated because the award of treble damages under PEPFA along with front pay creates a windfall for Ms. Keeling.

Whereas back pay compensates a discharged employee for injuries that occurred before trial, "front pay is an award for future injury that may occur after trial." *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 433 (Tenn. Ct. App. 1992); *see also Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006). Front pay is "an award of prospective damages for the loss of future earnings."[10] *Sasser*, 839 S.W.2d at 433. Front pay is "not intended to be punitive or to provide an employee a windfall." *Id.* (citing *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1469 (5th Cir. 1989); *Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1281 (11th Cir. 1992)). Courts have considered the following factors in order to reduce the speculative nature of determining a front pay award:

(1) the employee's future in his or her old job, (2) the employee's work and life expectancy, (3) the employee's obligation to mitigate his or her damages, (4) the availability of comparable employment opportunities and the time reasonably required to find another job, and (5) the amount of any award for liquidated or punitive damages.

---

[10] Reinstatement is the preferred remedy, where feasible. *Sasser*, 839 S.W.2d at 432. In the present case, however, the County is not asserting that Ms. Keeling could have been reinstated in her previous job.

*Id.* at 434 (citing *Fite v. First Tenn. Prod. Credit Corp.*, 861 F.2d 884, 893 (6th Cir. 1988)) (footnote omitted).

In arguing against front pay, the County emphasizes factor (5) above, in particular the award of punitive damages, and asserts that the trebling of damages under PEPFA, including damages for humiliation, pain and suffering, "obviates the need for any award of front pay." A similar issue was addressed by our Supreme Court in the case of *Coffey v. Fayette Tubular Products*, 929 S.W.2d 326 (1996). Ms. Coffey sued Fayette Tubular alleging that the company discharged her in retaliation for filing a worker's compensation claim. *Coffey*, 929 S.W.2d at 327. The jury found in favor of Ms. Coffey and awarded compensatory and punitive damages. *Id.* The trial court reduced the amount of punitive damages and awarded Ms. Coffey $20,000 in front pay. *Id.* The Court of Appeals further remitted the amount of punitive damages and vacated the front pay award. *Id.* at 328.

The Supreme Court restored the trial court's remitted punitive damages award in the amount of $500,000 and proceeded to address the issue of front pay. *Id.* at 328-31. The trial court found reinstatement was not feasible and awarded Ms. Coffey $20,000 in front pay. *Id.* at 332. In reversing this decision, the Court of Appeals relied upon factor (5) from *Sasser* and reasoned that, because of the punitive damages award, "'the award of front pay is inappropriate.'" *Id.* The Court of Appeals stated that "'the anticipated loss of future earnings is more than compensated by the punitive damage award which is not based upon any particular loss by plaintiff.'" *Id.* Ms. Coffey argued that the purpose of punitive damages is "to punish the defendant and deter it from engaging in similar conduct in the future." *Id.* Because punitive damages are not related to the amount of compensation to which a plaintiff is entitled, Ms. Coffee argued, a court should not take them into account when deciding whether to award front pay. *Id.*

Our Supreme Court, in *Coffey*, reviewed the decisions of other courts that had considered the issue and acknowledged that "perhaps a majority have concluded that the trial court must consider any existing award of liquidated or punitive damages in making its determination of front pay and that a substantial award may render front pay inappropriate or excessive." *Id.* The Court recognized that these decisions were generally based on the argument that front pay is inherently speculative and that, if punitive damages are not taken into consideration, the plaintiff may receive a windfall. *Id.* The Court, however, rejected this position:

> The first major problem with the "majority" rule is that it turns the proper relationship between compensatory and punitive damages on its head. Normally, the reasonableness of a punitive award is tested by its relationship to the harm suffered by the plaintiff. However, the reverse is not true: the reasonableness of a compensatory award, the jury's valuation of the plaintiff's harm, is *never* tested by its relationship to the punitive

award. This is because the defendant's actions may have been relatively blameless and worthy of little or no punitive response from the jury, and yet the plaintiff may have suffered a large amount of economic damages; on the other hand, the defendant's actions may have been particularly egregious and worthy of a substantial punitive response, yet the plaintiff may have suffered only a small amount of economic damages. By making the determination of front pay, which has no necessary relationship *at all* to the punitive award, dependent upon that award, the majority rule violates the normal, rational relationship between compensatory and punitive damages. Its invocation in setting front pay is therefore arbitrary and irrational.

Nor is this flaw overcome by the argument concerning the speculativeness of front pay and the possibility of the plaintiff obtaining a windfall. The answer to this argument is that the speculative nature of the front pay remedy carries just as much potential to shortchange the plaintiff as it does to grant it a windfall. The speculativeness of the remedy is a double-edged sword and is not cured by a mechanism that only allows adjustment in one direction.

*Id.* at 332-33 (citations omitted). The Supreme Court reinstated the front pay award after concluding that "the determination of front pay cannot be based on the punitive award." *Id.* at 333.

In the present case, the trial court declined to reduce its front pay award in light of the treble damages award:

Defendants finally argue that an offset on front pay should be applied because PEPFA already requires treble damages. However, treble damages under PEPFA are not punitive. *See Pewitt v. Buford*, [No. 01A01-9501-CV-00025, 1995 WL 614327, at *7 (Tenn. Ct. App. Oct. 20, 1995)]. Rather than intended to punish, PEPFA treble damages, unlike a punitive damage clause, is applied "to encourage open communication by imposing increased costs on the public employer that discourages unfettered communication." *Heriges v. Wilson County*, [No. 3:09-cv-0362, 2010 WL 4116719, at *9 (M.D. Tenn. Oct. 19, 2010)]. This Court finds no offset for front pay shall be made for treble damages in the calculation of equitable damages.

The County asserts that the present case is distinguishable from *Coffey* in that "the award of treble damages under PEPFA is directly related to the valuation of [Ms. Keeling's] harm, *i.e.*, the compensatory damages, which assuage[s] the evil the *Coffey* Court attempted to avoid in its ruling." Because there is a relationship between actual damages

and treble damages, the County argues, "reducing front pay based upon trebled back pay is neither arbitrary nor irrational."

Ms. Keeling points out that there is no caselaw interpreting "damages" under PEPFA to exclude front pay. She further cites *Trainor v. HEI Hospitality, LLC*, 699 F.3d 19 (1st Cir. 2012), an employment discrimination case in which the employer argued that front pay was not available, as a matter of law, "when a plaintiff has received the benefit of an award of double or treble damages." *Trainor*, 699 F.3d at 30. The court rejected this argument as "all bleat and no wool." *Id.* The court stated that "the purposes of front pay and multiplied damages are so disparate that a per se rule of mutual exclusivity makes no sense." *Id.* at 31. Front pay was designed to make the plaintiff whole, while multiplication damages were intended to be punitive. *Id.* Therefore, the court concluded, "there is no principled basis to bar front pay simply because multiplied damages are in prospect." *Id.*

In both *Coffey* and *Trainor*, the courts looked to the purposes underlying the damages involved. The courts in both cases concluded that front pay should not be reduced by punitive or treble damages. The County argues for a different result in this case based upon the fact that treble damages are computed by tripling compensatory damages. The same was true in *Trainor*. We decline to hold that the trial court erred by awarding Ms. Keeling front pay in this case.

IV. Mitigation of Damages.

Ms. Keeling argues that the trial court erred in finding that she failed to mitigate her damages.

The trial court found that "Defendants have carried their burden of proof that Plaintiff's employment at the Allstate Agency was substantially equivalent employment to her employment in the Coffee County codes enforcement office." On appeal, Ms. Keeling asserts that the trial court effectively placed the burden on her to prove that she mitigated her damages and that the evidence does not support the trial court's finding that she failed to mitigate her damages.

The applicable law is not in dispute. A terminated employee has "a duty to minimize [the loss of wages] by seeking other employment." *Frye v. Memphis State Univ.*, 806 S.W.2d 170, 173 (Tenn. 1991). The employee need not accept any employment offer, "but is only required to exercise reasonable diligence in seeking other employment of a similar or comparable nature." *Id.* Substantially equivalent employment to that from which the plaintiff was terminated "must afford the [plaintiff] virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983). Moreover, the employer has the burden to establish that there were

substantially equivalent positions available and that the plaintiff failed to exercise reasonable diligence in seeking such a position. *Id.* at 625.

After examining the record, we have determined that the evidence does not support the trial court's ruling on the issue of a substantially equivalent position. The County had the burden to show that there were substantially equivalent positions available,[11] and the trial court found that the job at the Allstate insurance agency was such a position. But the proof does not show that this job offered "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." *Id.* at 624. Ms. Keeling testified that the insurance agency job involved administrative responsibilities, paid $9 an hour, and that her position with Coffee County paid $23,000 a year, which she believed worked out to a higher hourly rate.[12] When asked whether she would have had medical benefits in the job, Ms. Keeling answered that she was "assuming they would have offered" her medical benefits. Ms. Keeling would not have had access to the state retirement or insurance benefits in the Allstate insurance agency position. There was no proof concerning opportunities for promotion, working conditions, or status in the Allstate job.

The trial court stated that it based its finding that the Allstate job was substantially equivalent employment "on Plaintiff's cross-examination testimony and her lack of credibility in explaining the reason she voluntarily left the Allstate Agency job." We have reviewed Ms. Keeling's cross-examination testimony concerning the job itself. Ms. Keeling's lack of credibility regarding her reasons for staying in the job for only a few months is not relevant to whether the job itself constitutes substantially equivalent employment. Based upon the lack of evidence in the record, we find that the County failed to meet its burden of proving substantially equivalent employment and, therefore, failed to prove that Ms. Keeling did not mitigate her damages.

Accordingly, we reverse the trial court's offset to damages for Ms. Keeling's purported failure to mitigate her damages.

V. Front Pay/Value of Benefits.

Finally, Ms. Keeling asserts that the trial court abused its discretion in declining to include the value of benefits in its front pay award.

A court's decisions regarding front pay are "'governed by the sound discretion of the trial court.'" *Vawter v. E.I. Du Pont De Nemours & Co.*, No. W2015-00874-COA-

---

[11] The County, itself, did not offer Ms. Keeling a position. She applied for positions with the County.

[12] At a salary of $23,348 a year (working 37.5 hours a week, 52 weeks a year), the Coffee County job works out to an hourly rate of $11.97.

R3-CV, 2016 WL 3228129, at *8 (Tenn. Ct. App. June 2, 2016) (quoting *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 923 (6th Cir. 1984)).  Thus, we apply the deferential abuse of discretion standard to a trial court's decisions on front pay.  *Id.*

Ms. Keeling argues that front pay is designed to substitute for reinstatement and to replace future compensation, which includes benefits.  She does not, however, cite any caselaw stating that front pay must include benefits.  In the circumstances of this case, the trial court specifically decided to exclude benefits, and we find no abuse of discretion in that decision.

CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded with costs of appeal assessed against the appellants, Coffee County, Tennessee and Glenn Darden.  Execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE